## LOGAN & COMPANY vs. THE CENTRAL RAILROAD.

1. Where the Central Railroad Company, whose road runs from Savannah to Macon, and thence, by itself and its branches or roads controlled by it, to other points, passed a rule that, "on and after date, no shipments of salt or other merchandise from Brunswick, in competition with Savannah, will be received for local stations on this line, or passing over the Southwestern Railroad division for points beyond, unless charges are prepaid and shipments delivered at warehouse by drays, as local business, when regular local tariff rates from Macon will be assessed on same," such rule was con-

trary to the act of 1874 to prohibit monopolies; and for damages resulting from its enforcement as to salt shipped from Brunswick by the East Tennessee, Virginia and Georgia Railroad to Macon, and to be carried beyond that point by the Central Railroad, a right of action accrued.

(a.) As to the general duties of common carriers of goods of this character, especially of railroad companies, see 19 C. L. J., 133; 135 Mass., 201; 13 Fed. Rep., 9; Code, §2069.

2. While the competing railroad company might sue for damages to its general business, the shipper, who is damaged by the wrongful requirement of unshipping, draying and re-shipping, and the consequent waste, delay and injury. has a right of action against the railroad company causing the same.

3. A connecting line, in the sense of the act of 1874, is where any railroad at its terminus, or any intermediate point along its line, joins another, or where two railroads have the same terminus; and where a railroad is adjacent to another and capable of being joined to it by a switch, either at its terminus or anywhere along its line where they meet or converge, the right is given to make such connection, whether it be voluntarily granted or not.

4. The lessee of a railroad is a common carrier over a line leased and controlled by it as much as over its own line, and is responsible in damages in respect to the leased road, as well as its own, to any person who has a right of action given him by law against railroad companies.

March 17, 1885.

Railroads. Monopolies. Common Carriers. Before Judge SIMMONS. Bibb Superior Court. October Term, 1884.

Logan & Company brought their action on the case in Bibb superior court against the Central Railroad, alleging, in brief, as follows: Plaintiffs are dealers in salt, and as such procure large quantities of that article outside of the state, and store it at some port on the coast for subsequent shipment, on orders, to various parts of the state. They had been in the habit of storing salt at Brunswick and shipping by the East Tennessee, Virginia and Georgia Railroad to Macon, and thence over the lines of the defendant and its branches and the Southwestern Railroad, which defendant controlled and operated under lease. It

was the custom and duty of common carriers to receive such shipments in car-loads and to transport such cars unbroken over their lines, and defendent did this until October 12, 1882, when it promulgated the order set out in the decision. Plaintiffs then shipped forty-seven car-loads of salt, to be carried to Macon by the East Tennessee, Virginia and Georgia Railroad, and thence in bulk along the line of the defendant and its branches and the Southwestern Railroad, to various points, where they were consigned to customers of plaintiffs, and paid the freight to Macon in advance. The first railroad carried the cars to Macon and to the freight yard of the defendant, and tendered them to the latter for shipment; but it refused to receive and transport them. This was in bad faith, and was not based on any defect in the cars, but was merely a discrimination against a competing line of railroads. Defendant refused to ship the salt, unless it was unloaded from the cars bringing it to Macon, carried by drays from the yard of the East Tennesse, Virginia and Georgia Railroad to that of defendant, and re-loaded in its own cars. Defendant was, at the time, the owner of a large line of drays, and its object was to compel plaintiffs to patronize them. This was in violation of its duty as a common carrier and of the statutes of the state. The value of the salt so refused was $7,000.00, and plaintiffs are entitled to recover that amount, with twenty-five per cent damages, under the statute.

By amendment, the following items of damage were set out:

First. In the sum of $300.00, which plaintiffs have been compelled to expend for drayage, by reason of the refusal of defendant to receive the said cars—such drayage being rendered necessary to haul the salt from the depot of the East Tennessee, Virginia and Georgia Railroad Company to that of defendant.

Second. Damage to plaintiffs' business growing out of the delay in the transportation of said forty-seven car-

loads of salt. The same could not be hauled on drays, except in fair weather, as the value thereof would have been destroyed by exposure to rain. The method of transportation by drays is, therefore, very slow. Being compelled to transfer the salt in this manner, plaintiffs were greatly hindered and delayed in complying with their contracts with customers in relation to said forty-seven car-loads of salt, and in disposing of the same, and they aver that their loss and damage in connection therewith amounts to the sum of $2,000.00.

Third. Injury and damage to their business, caused by the wrongful action of the defendant, by reason whereof they lost many of their customers and were hindered and prevented from competing successfully with other merchants in the same line of business, and who were located at points to which the railroad companies shipped the said merchandise in cars; and were prevented from conducting their business expeditiously and successfully; by reason whereof plaintiffs sustained damage to the amount of $7,000.00.

Fourth. Expenses of litigation, caused by said wrongful act, to-wit, $1,000.00.

Fifth. Plaintiffs further show that, for the violation of a public duty, they, as being interested in the performance of that duty, are entitled to recover from the defendant punitive damages sufficient to restrain the defendant from any further violation or attempted violation of said public duty, to wit, the sum of $5,000.00.

Service was perfected by serving the agent of the Central Railroad personally.

Defendant demurred orally, on the ground that no cause of action was shown by the plaintiffs; that, while the action was against the Central Railroad, most, if not all, of the wrongs complained of were done by the Southwestern Railroad; and that, therefore, proper service had not been perfected.

The demurrer was sustained, and plaintiffs excepted.

HILL & HARRIS ; WASHINGTON DESSAU, for plaintiffs in error, cited, on duty of common carriers, Code, §§2070, 2069 ; Lawson Usage, —; Browne Usage, p. —; Hutch. Car., §§297, 112, 83, 84, 95, 299, 310 ; 10 Fed. Rep., 210, 869 ; L. R., Eng. & Irish App., 226 ; 57 Me., 188, 200 ; 24 Penn. St., 378 ; Hodges Railways, 491 ; 56 Ill., 365 ; 49 Id., 33 ; 2 Am. R., 31 ; 13 Id., 72, 459 ; 18 Id., 754 ; 4 Otto, 130 ; 71 Ga., 61 ; 13 Fed. Rep., 4 ; 135 Mass., 201 (S. C. 15 Am. & Eng. R. R. Cas., 196, 200) ; 14 Allen, 462, 469 ; 5 Am. & Eng. R. R. Cas., 480 ; 19 Cent. L. J., 111 ; 30 Alb. L. J., 143 ; 39 Ga., 636 ; Aug. Car., §399 ; 2 Redf. Rwys., §176.

On statute, Acts 1874, p. 93 ; Code, §§719 (s), (q), 2077, 2078 ; Dwarris' Statutes, 726 ; 2 Kelly, 85 ; 5 Id., 368 ; 9 Am. & Eng. R. R. Cas., 374.

On service, 69 Ga., 268 ; 68 Id., 219.

On demurrer, 60 Ga., 164 ; 55 Id , 15 ; 64 Id., 177 ; 57 Id., 144 ; 66 Id., 709.

On damages, Browne Car., 79, t. p. 153 ; 60 Ga., 164 ; 1 Suth. Dam., 121 ; 3 Id., 209 ; 64 Ga., 177 ; 55 Id., 15 ; 66 Id., 709 ; 57 Id., 144.

LYON & GRESHAM, for defendant, cited, on duty of common carriers, Wood's Browne Car.; 147 ; Ang. Car., 115 and cit., 391 ; 40 Ga., 419 ; Hutch. Car., §297 ; 52 N. H., 448 ; Story Bailments, §508 ; 5 Bing., 217 ; 10 N. H., 436.

On statute, Code, §§719 (q), 5094 ; Acts 1882–3, p. 145 ; 56 Ga., 498 ; 42 Id., 642 ; 68 Id., 653

On service, Code, §3369 (a).

On damages, 38 Ga., 519, 37 ; 53 Id., 385 ; 56 Id., 498 ; 42 Id., 642.

JACKSON, Chief Justice.

Logan & Co., dealers in salt, shipped on the East Tennessee, Virginia and Georgia Railroad, in cars of that road, by the car-load, salt to Macon, and thence to points on the Central Railroad, or it branches, or other roads controlled

by it, as lessee thereof. When the salt thus shipped arrived at Macon, the Central Railroad refused to receive the salt in the cars, though of the same gauge as its own, and not defective in any way, but required the plaintiffs to unload and deliver it by drays, as local shipments from Macon, under the following rule of the company :

"MACON, GA., October 12, 1882.

NOTICE.

" On and after date, no shipments of salt or other merchandise from Brunswick, in competition with Savannah, will be received for local stations on this line, or passing over the Southwestern Railroad division for points beyond, unless charges are prepaid, and shipments delivered at warehouse by drays, as local business, when regular local tariff rates from Macon will be assessed on same."

On demurrer to the declaration alleging facts to this effect, the court dismissed the suit, sustaining the demurrer, and error is assigned thereon in this court.

1. Without reference to the general duties of common carriers of goods of this sort, especially of railroad companies, as founded on common usage, and as held by some of our American courts (Peoria, etc., Railroad Company *vs.* Chicago, etc., Railroad Company, 19 Central L. J., 143 ; also 135 Mass., 201 ; 13 Fed. Rep., p. 9), and recognized generally by section 2069 of our Code, we are clear that the point made is clearly controlled by a special act of the general assembly of 1874, entitled an act to prohibit monoplies, and codified in section 719 (q), (r), (s), (t), (u).

Section 719 (q) declares, in effect, that all railroad companies in this state shall, at their terminus, or any intermediate point, deliver to the connecting road, having the same gauge, all cars passing over their lines containing freight, by any route, at the option of the shipper, according to customary or published rates, to any point over or beyond the connecting road, and if it be not done with reasonable diligence, the shipper—in the language of the section, "the owner or consignee"—shall have his right of action for the value of the goods, damages, etc.

v 74-44

The next section, 719 (r), provides that, where one road thus joins another at any point along its line, or where they have the same terminus, either line having the same gauge may, at its own expense, join its track to the other road by switches, should the other refuse to join.

Section 719 (t) enacts that the road thus wishing to join by switches the other shall have power to procure the use of the franchise of the other, so far as is necessary to make the connection, in the same manner as is provided for ascertaining the value of and paying for private property taken for the use of the road, as provided in the charter of the Central Railroad and Banking Company.

Section 719 (s) prohibits all discrimination in rates of freight in favor of one line or route connected with any road against another, or in favor of the balance of its own line, when part of it is sought to be run in connection with any other route, and specifically enacts that the same rates shall be for all, and the same usual and customary facilities for interchange of freights shall be afforded to " patrons of each and all routes or lines alike; any refusal of the same shall give a like right of action as mentioned in section 719 (q) of this Code."

Section 719 (u) provides that the foregoing sections shall not apply to shipments from points beyond this state, except such as come by sea, or pass over the Western and Atlantic Railroad.

The above is a summary of the legislation of this state in the act to prevent monopolies, passed in 1874, and codified in the sections of the Code above named. They seem to us to make the point too clear for argument or cavil.

Salt coming into Georgia by sea, and landed in Savannah, is given preference, by the rule of the Central Railroad and Banking Company, over salt landed in the state at Brunswick. Salt passing over the East Tennessee, Virginia and Georgia Railroad Company, formerly the Macon and Brunswick, in the part of that line under consideration, and in 1874 the property of the state, perhaps, is re-

quired to be unloaded from the cars of that road, and delivered in drays to the Central Road's connections, while that which passes over its own road passes in the car into which it was placed in Savannah, thus monopolizing the carriage of salt from the sea to all points in the interior of Georgia, in the teeth of the act of 1874, to suppress monopolies. The effect of the rule is to choke competition in this prime necessary of life, and to force consumers to buy at the price shippers to Savannah and common carriers thence to the interior may see fit to put upon it. It is to choke competition by choking the only other line of railway from the sea to the interior of the state. It is in the teeth of section 719 (s), in this, that it does not " afford the usual and like customary facilities for interchange of freights to patrons of each and all routes or lines alike," because the patron of the route or line from Savannah has the facility of carrying his salt in bulk to Forsyth or Griffin, or Americus, or Fort Valley, in the cars in which he shipped it at Savannah, while the patron of the line or route from Brunswick must unship and dray his at Macon.

It makes no difference that the one line is not the property of the Central and the other is its own property. It still collides with section 719 (s), and strikes the law right in its forehead. It shall not discriminate, says that law, "in favor of any line or route connected with it, as against any other line or route, nor when a part of its own line is sought to be run in connection with any other route, shall such company discriminate against such connecting line, or in favor of the balance of its own line, but shall have the same rates for all, and shall afford the usual and like customary facilities for interchange of freights to patrons of each and all routes or lines alike."

It really would be clear that, if the general assembly had enacted a general law in the words used by the Central Railroad and Banking Company in its rule and published notice, the courts would be obliged to hold that the act of 1874, codified as above, is so much, on its face, re-

pugnant to this rule and notice that the latter repealed it by necessary implication—an implication as irresistible as if it had said, the general assembly enacts that the act of 1874, embodied in section 719 (q), (r), (s), (t) and (u), be, and the same is hereby repealed—an appropriate title to which repealing act would have been, an act to abolish competition, and restore a monopoly in carriage of freight from the sea to the interior of the state.

2. It has been insisted, however, that the owner or consignor of this salt from Brunswick had no right of action; that it is only the competing road's company that can sue, if suit can be brought at all.

It would be strange if such were the law. It may be true, and is doubtless true, that the competing line may sue and recover for damages to its general business; but the shipper is the very person who is damaged by the wrong of requiring him to unship and waste his salt, and delay the delivery of his freight, and injure, if not destroy, his trade, in the loss of customers or otherwise.

Argument, however, or principles of common law in regard to common carriers, or the fundamental policy on which franchises are granted to chartered corporations, and private property, as for public use, is made to give way to lines of railways for public carriage for the use of the public, are not necessary to be called in aid of the right of the consignor or consignee to sue for damage in a case like this, however clear it is that it is for the public that these privileges are granted, and that these consignors and consignees, and those who deal with and buy from them, are the public; these are not necessary to this case, because the statute of 1874, from which the right of action to any person aggrieved is derived in Georgia, in express language gives the right to this owner of the salt.

Section 719 (q) enacts that " any failure to do so (that is, to switch off and deliver the cars laden with his freight) shall give a right of action to the owner or consignee for the value of the same," etc.; and section 719 (s) declares that

" any refusal of the same (that is, to give the same rates
to all, and afford the same facilities for interchange of
freights to patrons of all lines alike) shall give a like right
of action, as mentioned in section 719 (q) of this Code."
Therefore, by the statute itself, the right to sue is vested
in the plaintiff in this case, who is the owner of the salt,
to the transportation of which the same facilities were not
given, as to the transportation of that over defendant's
own line from Savannah, and destined to some point fur-
ther over its lines, branch lines and leased lines.

3. It has also been argued that the Central line and the
Brunswick, or East Tennessee, Virginia and Georgia line,
are not connecting lines in the view of the statute.    It can-
not mean a line in which the road is in privity by contract,
because coercion, or the stern mandate of the law, would
not be necessary then to be invoked.    The contract which
connected them would regulate all these differences.    The
terms of union and facilities would therein be settled.    It
is where agreement is not had, where a common interest
has not merged all the lines into oneness of action and an
agreed pool of dividing the spoil is not made, that the law,
to prevent monopolies and to encourage competition—that
life of all trade—intervenes, and commands a union by
switches, by agreement, if it may be, if not, by coercion,
just as it coerced the natural person to give up his prop-
erty at a fair valuation for the public good in creating
these artificial persons with all their franchises.

But here again the statute of 1874 makes argument or
illustration unnecessary.    Section 719 (q) declares the con-
necting line to be any line " at the terminus, or any in-
termediate point;" and section 719 (r) describes the con-
necting line by prescribing that " where any railroad, in
this state, joins another at any point along its line, or where
two of such roads have the same terminus, either line hav-
ing the same gauge may, at its own expense, join its track
by the proper and safe switches, etc."    So that it must be
only an adjacent road, capable of being joined by switch

to the other, and this may be at the terminus or anywhere on the line where they meet or converge or connect, at village or depot or city. So section 719 (t) uses the language, " seeking such connection," and declares that, when it is sought, if refused, " to allow the connecting switches put in its line when requested," etc., then coercion follows, as it did when private property was taken to lay down the bed of the Central Railroad. Really the statute covers every point like a blanket.

4. Of course it is not necessary to say that the lessee of a road is a common carrier over the line leased, just as much as over its own lines, and so long as the Central Railroad Company leases and runs the Southwestern, it is responsible in damages in respect to that road line as well as its own to any person who has a right of action given him by law against railroad companies. The act of 1874 regulates its duties in respect to the Southwestern just the same as it does in respect to its own lines.

The conclusion we reach from the statute itself, without looking beyond it, is that the court erred in dismissing the action, and the law requires a reversal of the judgment and the re-instatement of the case. If there be any minor trouble, such as notice or service of any sort, any such defect may be amended by proper service, and the suit proceed.

Judgment reversed.