## GEORGIA RAILROAD AND BANKING COMPANY et al. v. MADDOX et al.

1. Under the charter of the Georgia Railroad & Banking Company and the amendment thereto, it had lawful authority to lease to another its franchises as to the transportation of both freight and passengers; and in such franchises were included all rights and privileges necessary to conducting the business for which the company was incorporated, among which was the right to maintain yards at terminal points for the manipulation of trains. Such franchises of the company passed by lease to the Louisville & Nashville Railroad Company and, in part, to the other defendants. The Louisville & Nashville Railroad Company had lawful power to lease part of the right of way of the Georgia Railroad & Banking Company, in Atlanta, to the Atlanta Belt Line Company, to be used as a terminal yard. The charter of the Atlanta Belt Line Company authorized it to accept from the Louisville & Nashville Railroad Company, as lessee of the Georgia Railroad & Banking Company, the right to use such terminal yard.

2. The Atlanta Belt Line Company had the statutory power to lease its road, property, and franchises to the Atlanta & West Point Railroad Company, and the latter company had, by its charter as amended, the right to accept such lease.

3. The traffic contract entered into between the Atlanta and West Point Railroad Company and the Louisville & Nashville Railroad Company, under the terms of which each of these companies acquired the right to use certain property of the other in the city of Atlanta, to facilitate the transportation of freight, was legal.

4. Where a railroad terminal yard is located and its construction authorized under statutory powers, if it be constructed and operated in a proper manner, it can not be adjudged a nuisance. Accordingly, injuries and inconveniences to persons residing near such a yard, from noises of locomotives, rumbling of cars, vibrations produced thereby, and smoke, cinders, soot, and the like, which result from the ordinary and necessary, and therefore proper, use and operation of such a yard, are not nuisances, but are the necessary concomitants of the franchise granted. The terminal yard, the operation of which is sought to be enjoined in this case, was located and its operation authorized under statutory powers.

5. A railroad terminal yard, though authorized by statute, may become a nuisance by improper construction or by subsequent improper operation.

6. Though the evidence in this case, both as to construction and operation, was conflicting, the granting generally of the injunction was erroneous; for, properly interpreting the language used in the opinion filed by the trial judge, in the light of the strong and decided preponderance of testimony showing that the construction of the yard upon a grade was proper, it is manifest that he did not grant the injunction solely because the yard was not laid out upon a level. This being so, and the effect of the injunction being to entirely prevent even the proper carrying on of a lawful business, instead of pointing out and restraining particular acts which, because unnecessary or unlawful, were nuisances, the judgment excepted to can not be upheld; and moreover, save as to operations on the Sabbath, there was no evidence suffi-

ciently clear and distinct to enable the court to designate any such acts as those just indicated and specifically enjoin the commission of the same.

Argued February 15, — Decided August 9, 1902.

Injunction. Before Judge Gober. Fulton superior court. July 13, 1901.

*Joseph B. & Bryan Cumming, Dorsey, Brewster & Howell, Sanders McDaniel*, and *King & Spalding*, for plaintiffs in error.

*H. E. W. Palmer, G. L.` Bell*, and *B. H. Hill*, contra.

FISH, J. The record shows that twenty-four residents and owners of dwelling-houses at Inman Park, in the eastern portion of the city of Atlanta, and the trustees of two churches located there, filed a petition, with various amendments thereto, for an injunction against the Georgia Railroad & Banking Company, the Louisville & Nashville Railroad Company, and the Atlanta & West Point Railroad Company, to restrain the operation of a terminal yard located on the right of way of the first named company, adjoining Inman Park. The grounds upon which the injunction was sought were, that such yard and the manner in which it was conducted was a nuisance, and that the damage resulting therefrom to the petitioners was special and irreparable. Inman Park was laid out in 1887 and 1888, as a residential, church, and school site, upon which valuable residences and churches were soon afterwards erected, and the park can be used for no other purposes. This park is bounded on its entire southern frontage by the right of way, two hundred feet wide, of the Georgia Railroad & Banking Company. This company was incorporated in 1833, and its name changed to The Georgia Railroad & Banking Company by an amendment to its charter in 1835. Its railroad franchises, roads, rolling stock, etc., were leased to William M. Wadley and his assigns in 1881, and the Louisville & Nashville Railroad Company became the lessee through an assignment of the Wadley lease. On October 17, 1899, the Atlanta Belt Line Company was incorporated, under the general railroad law of this State, to construct a steam railroad from Oakland City, on the Atlanta & West Point Railroad, to a point on the Georgia Railroad at or near the eastern corporate boundary of the city of Atlanta. The road was so built. Its western terminus was about two miles west of the eastern terminus of the Atlanta & West Point Railroad, and its eastern terminus was about

one mile and three quarters east of the western terminus of the Georgia Railroad. On November 30, 1900, the Louisville & Nashville Railroad Company leased to the Atlanta Belt Line Company a part of the right of way of the Georgia Railroad & Banking Company, at the junction of the two roads, for terminal facilities; and it is upon this leased land that the terminal yard in question is now located. On September 12, 1900, the Atlanta & West Point Railroad Company, which was incorporated by the legislature before the enactment of the general railroad law of this State, had its charter amended so as to include three parts of the provisions of the general railroad law, to wit: First, the sixth paragraph of section 2167 of the Civil Code, which reads as follows: "To cross, intersect, or join or unite its railroads with any railroad heretofore or hereafter to be constructed, at any point in its route, or upon the ground of any other railroad company, with the necessary turnouts, sidings, and switches, and other conveniences necessary in the construction of said road, and may run over any part of any railroad's right of way necessary or proper to reach its freight-depot, in any city, town, or village through or near which said railroad may run." Second, the 2173d section of the Civil Code, the power given by this section being, "to lease or purchase the property of any other such company and hold, use, and occupy the same in such manner as they may deem most beneficial to their interest." Third, the 2179th section, by which plaintiffs in error claim that the Atlanta & West Point Railroad Company was empowered to purchase or lease the property and franchises of any other railroad company whose railroad shall connect with or form a continuous line or system with the railroad of such company, upon such terms as may be agreed upon.

On November 30, 1900, the Atlanta & West Point Railroad Company leased the Atlanta Belt Line, with all its rights, property, and franchises, including the lease of that part of the right of way of the Georgia Railroad & Banking Company upon which the terminal yard in question is located. The Atlanta & West Point Railroad Company began its transportation business over the Atlanta Belt Line and its use of the terminal yard on or about January 1, 1901. Under a traffic contract between the Louisville & Nashville Railroad Company and the Atlanta & West Point Railroad Company, the latter was granted the joint use of the Georgia Railroad & Banking Company's terminals in and near Atlanta, and of its offices,

station buildings, freight-depot, coal-chutes, water-tanks, platforms, and yards, and the Atlanta and West Point Railroad Company granted to the Louisville & Nashville Railroad Company the equal use, in common, of its warehouses and grounds near Decatur and Butler streets, its freight warehouse near Loyd street, and its tracks and terminal yard on the right of way of the Georgia Railroad & Banking Company, at and near Inman Park.

The petition for injunction and the amendments thereto aver that the original lease of the Georgia Railroad and Banking Company to William M. Wadley was void, because unauthorized by that company's charter; that, for the same reason, the lease by the Louisville & Nashville Railroad Company of the part of the right of way of the Georgia Railroad & Banking Company to the Atlanta Belt Line, for terminal facilities, was void; that there was no physical connection between the Atlanta & West Point Railroad and the Georgia Railroad, as the eastern terminus of the former road was at Nelson street bridge, in the western part of the city of Atlanta, and the western terminus of the Georgia Railroad was in the center of the city, and that therefore the terminal yard at Inman Park was located in a place not authorized by law, which made it a nuisance per se. The petitioners also contended that the yard could be located on the Atlanta Belt Line where there were no residences; that the yard as constructed is partly on a steep grade, which intensifies the noises from locomotives and moving trains, and increases the volume of smoke and cinders that are cast into their houses; that work in this terminal yard, which consisted of dissecting trains and switching cars and making up and moving off freight-trains by inefficient and overloaded engines, was carried on almost unremittingly every day and night, including Sundays; and that these annoyances, with the unnecessary blowing of whistles, ringing of bells, and screaming of trainmen produced irreparable injury to their property, and made comfort in the daytime and sleep at night almost an impossibility to themselves and the members of their families. The petitioners submitted affidavits tending to support the various averments and contentions made in their pleadings. The defendants answered that the terminal yard was located in pursuance of statutory powers, was skilfully and properly constructed, and caused less noise and inconvenience, in switching cars and other work thereon, than if it had been entirely on a level grade, and was not

negligently or injuriously operated in any respect. These averments were supported by affidavits and other documentary evidence. The judge of the court below granted a preliminary injunction, on July 13, 1901, restraining the use of the terminal yard altogether on and after October 1, 1901, and until that date enjoining its use, as such, on Sundays, and between the hours of nine p. m. and six a. m. on other days. The defendants excepted to the grant of such injunction, and just before he certified the bill of exceptions presented by the defendants, on August 1, 1901, the judge modified such injunction so that the same, " without reserve, is suspended after the first of October (1901), until the remittitur is entered, and shall not take effect until five (5) days after entry of the remittitur from the Supreme Court, in the event such judgment is affirmed. The restraint from switching as granted in said order of July 13th, 1901, on Sundays, and from 9 p. m. to 6 a. m. on other days, will continue until said injunction without reserve goes into effect."

1. The Atlanta Belt Line Company was incorporated under the general railroad law of this State. Its eastern terminus, according to its charter, was to be at a point on the Georgia Railroad at or near the eastern corporate boundary of the city of Atlanta. This gave it a large discretion in selecting the point for such terminus, and the company's exercise of such discretion " will not be revised unless it has clearly exceeded its limits or acted in bad faith." 3 Elliott, Railroads, § 919, p. 1264; Fall River Co. *v.* Old Colony R. Co., 5 Allen (Mass.), 221. And such revision, whatever might be the private remedies of individuals to prevent the location at the point selected, can not be made, certainly in a collateral proceeding, after the completion of the work. Cleveland & Pittsburg R. Co. *v.* Speer, 56 Pa. St. 325. The Atlanta Belt Line Company possessed the statutory power to acquire, by condemnation, purchase, or lease, any land necessary for its terminal facilities at its eastern terminus. Civil Code, § 2167, par. 3. And when terminal yards are necessary, they must be provided by a railroad to facilitate its business of transportation. 4 Elliott, Railroads, § 1479. It acquired the land needful for this purpose on a part of the right of way of the Georgia Railroad & Banking Company, by lease from the Louisville & Nashville Railroad Company, which was and still is the sublessee of the Georgia Railroad & Banking Company. To make this lease valid, the lessor must have had the power to make

the lease, and the lessee the power to accept it; for if the lease was beyond the power of either, it was as invalid as if beyond the power of both. St. Louis & T. H. R. Co. *v.* Terre Haute & I. R. Co., 145 U. S. 393, 402; 2 Elliott, Railroads, §§ 430, 432. See also *Central Railroad Co.* v. *Macon*, 43 *Ga.* 644. The Atlanta Belt Line Company, as shown above, had the statutory power to accept the lease. The question then arises, did the Louisville & Nashville Railroad Company possess the power to make the lease? The Georgia Railroad & Banking Company was leased to William M. Wadley and his assigns on May 7, 1881, and an assignment of this lease was duly procured by the Louisville & Nashville Railroad Company, and the Georgia Railroad & Banking Company has ever since acquiesced in the subletting by Wadley. By such acquiescence the Georgia Railroad & Banking Company occupies the same position as if it had originally leased directly to the Louisville & Nashville Railroad Company.

Moreover, if the charter of the Georgia Railroad and Banking Company confers the power of leasing in the manner above referred to, then such power passed, as a part of the franchise, to the lessee, in the absence of any restricting clause or provision in the lease. See 19 Am. & Eng. Enc. L. (1st ed.) 897. The sections of the charter of the Georgia Railroad and Banking Company applying to the power of leasing are section 12 (Acts 1833, p. 262) and section 14 (Ib. 263). Section 12 is as follows: "That the said Georgia Railroad Company shall *at all times* have the exclusive right of transportation or conveyance of persons, merchandise, or produce over the railroad and railroads to be by them constructed, *while they see fit to exercise the exclusive right: Provided,* that the charge of transportation or conveyance shall not exceed fifty cents per hundred on heavy articles, and ten cents per cubic foot on articles of measurement, for every one hundred miles; and five cents per mile for every passenger: *Provided always,* that the said company may, *when they see fit,* rent or farm out *all or any part* of their said exclusive *right of transportation* or conveyance of persons on the railroad or railroads, with the privilege to *any individual or individuals, or other company, and for such term as may be agreed upon, subject to the rates above mentioned.* And the said company, in the exercise of *their right of carriage or transportation of persons or property,* or the persons so taking from the company the

*right of transportation or conveyance,* shall, so far as they act on the same, be regarded as common carriers." (Italics ours.) And section 14 provides: " That whenever the company aforesaid shall see fit to farm out, *as aforesaid,* to any person or persons, or body corporate, *any part* of their exclusive right of conveyance *and transportation,*" (italics ours) they .may provide for the character of the locomotives and cars that the lessee shall use. It is violative of all rules of interpretation to select one sentence or clause of a section in a charter, and shut one's eyes to the rest of the section, with the view of getting the sense of the whole section. And it is equally unwarranted to pass over altogether a succeeding section which contains words conclusively showing a direct reference to and connection with a prior section on the same subject-matter. " Special charters and general incorporation laws are, like other legislative acts, within the rule that in construing a statute the whole act must be looked into, and all its parts harmonized, if possible." 7 Am. & Eng. Enc. L. (2d ed.) 713. It is true, as was said in the case of *Georgia Railroad* v. *Smith,* 70 *Ga.* 700, that the powers given to a corporation must appear in its charter in plain words or by necessary implication, and that all reasonable doubts shall be resolved against the corporation in favor of the public. This is but an iteration of an oft-repeated principle. " The true meaning of the doctrine is, that grants to corporations are construed most *favorably to the public,* when there exists a *reasonable doubt* as to the extent of the privileges conferred. But it does not follow from this that such a grant is to be construed so strictly as to wrest the meaning of words from their common and well-understood significance; but such a grant, like every other instrument, public or private, is to be construed *according to the plain meaning of the words,* where they are free from ambiguity and doubt." 4 Thomp. Corp. § 5345.

Now, let us construe sections 12 and 14 of the charter of the Georgia Railroad & Banking Company according to law, which requires it to be done without beginning and ending in the middle of either section or arguing in a circle. In the first place the company has *at all times* the exclusive right of transportation or conveyance of persons or property, " *while they see fit to exercise the exclusive right.*" If they do not see fit to exercise it after possessing it, the necessary implication is that they would or could farm it

out in whole or in part. This conclusion passes from the state of a necessary implication to that of an express grant to lease such right, upon a consideration of the subsequent words in the same section and by connecting and construing this part of section 12 with section 14, as we will show further on. Next there are two rates specified for the transportation of two classified species of property, and one single rate for the conveyance of persons. Then immediately follows the right of the company, when they see fit, to farm out to any person or persons, or other company, the whole or any part of their exclusive *right of transportation* or conveyance of persons on the railroad or railroads, with the privileges, for such term as may be agreed on. Almost an identical right as is given by these words alone is found in the charter of the Monroe Railroad Company, granted in 1833 (Acts 1833, p. 243), and the words were construed, in the case of *Central Railroad* v. *Macon*, 43 *Ga.* 605, to confer upon the company the right to lease its road, in whole or in part, for the transportation of persons and property. Such leasing by the Georgia Railroad Company is to be "*subject to the rates* above mentioned." The word "rates" here clearly relates to the charges fixed for the transportation of property and the conveyance of persons, for there is only one rate as to passengers; and hence the power to lease, in whole or in part, the exclusive right of transportation *of property* is thus further shown by express and apt words. Again, the company, while exercising its right of carriage or transportation of persons *or property*, or the persons *so taking* [leasing] from the company the right [such right] of transportation or conveyance, shall be regarded as common carriers." These words show that the lessee of the company, as well as the company itself, while exercising the rights conferred, would be a common carrier, with the "right of carriage or transportation of persons *or property.*" And in section 14 the power is expressly given to the Georgia Railroad Company, when it sees fit, to farm out *as aforesaid* (that is, as specified in section 12) to any person or persons, or other company, "*any part* of their exclusive right of conveyance *and* transportation." Such "exclusive right of conveyance and transportation" is expressly stated, in section 12, to be the "exclusive right of transportation or conveyance of persons, *merchandise, and produce* over the railroad or railroads to be by them constructed."

The act of December 18, 1835 (Acts 1835, p. 180) amending the charter of the Georgia Railroad Company, besides changing its name to the Georgia Railroad & Banking Company, empowered it "to have, purchase, receive, possess, enjoy, and retain to them and their successors, lands, rents, tenements, hereditaments, goods, chattels, and effects of whatsoever kind, nature, or quality the same may be, sufficient for the construction of banking-houses and the erection of the railroad only, and the same to sell, grant, demise, alien, or dispose of." The word "demise," used in the enumeration of the powers of the company under this amendment, means, technically, to lease for a term of years. 5 Am. & Eng. Enc. L. (2d ed.) 538. Thus, by express words, which do not admit of any reasonable doubt, the charter of the Georgia Railroad & Banking Company clearly confers the power to lease its exclusive right of transportation of property or conveyance of persons, in whole or in part, to any person or persons, or other company, *and for such term as may be agreed upon.* See also the following cases bearing on the right of the Georgia Railroad & Banking Company to exercise such power of leasing: *Arnold & DuBose* v. *Georgia Railroad & Banking Co.*, 50 *Ga.* 304; *Banks* v. *Georgia Railroad & Banking Co.*, 112 *Ga.* 655.

It is contended by the defendants in error that "all right" of the Georgia Railroad & Banking Company "to lease anything" expired in thirty-six years, and therefore it had no power to make the lease to Wadley in 1881; and section 15 of the charter of the company is cited in support of this contention. It seems to us that the mere reading of this section shows that this contention is not sound. The section provides: "That the exclusive right to make, keep up, and use the railroads and transportations authorized by this act shall be for and during the term of thirty-six years, to be computed from the time when the said road from Augusta to either of the points hereinbefore designated shall be completed for transportation. . . And after said term of thirty-six years shall have elapsed, though the legislature may authorize the construction of other railroads, for the trade and intercourse contemplated herein; *Nevertheless,* The Georgia Railroad Company shall remain incorporate, and vested with all the estate, powers, and privileges as to their own works herein granted and secured, except the exclusive right to make, keep up, and use railroads over and through such parts of the country, that shall so have expired

by the foregoing limitation." Construing these two sentences together, it is evident that the intention of the General Assembly was, that until the period of thirty-six years therein provided for had expired, the company chartered by this act should have "the exclusive right to make, keep up, and use" railroads between certain points designated in the charter, and that the legislature should have no power, during this period, to authorize any other company or person to construct and operate any other railroad, or railroads, between such points; but, after the expiration of this period, the legislature might "authorize the construction of other railroads for the trade and intercourse contemplated" by the act; and that even when the designated period of thirty-six years should have elapsed, and when other railroads had been constructed, under legislative authority, between these points, the Georgia Railroad Company should nevertheless remain incorporate and be "vested with all the estate, powers, and privileges as to their own works" granted by the charter, "except the exclusive right to make, keep up, and use railroads over and through [the] parts of the country" in which the act granted such company the exclusive privilege of so doing for the term of thirty-six years from the time the road was completed from Augusta to any of the other points designated in the charter. That this is the meaning of this 15th section is very clear when we take into consideration the provision that, after the expiration of the limitation period, the company was to remain a corporation and to be "vested with all the estate, powers, and privileges *as to their own works*," granted and secured in the act. When the period of limitation should be completed, all the estate, powers, and privileges of the company as to its own works, granted and secured by the act, were to remain in full force and effect, but the right to prevent the construction and operation of other works of a like character within its hitherto exclusive territory was to terminate. If the company, after the lapse of the thirty-six years, was "to be vested with all the estate, powers, and privileges as to their own works herein granted and secured, except the exclusive right to make, keep up, and use railroads over and through such parts of the country," we can not conceive what right, power, or privilege granted by the charter, save the right to prevent the construction and operation of competing railroads in the territory designated, the Georgia Railroad & Bank-

ing Company lost by the completion of the period of limitation. If, at the completion of such period, it was still to survive as a corporation and to be vested with all the estate, powers, and privileges as to its own works, except the exclusive privilege indicated, it was, when the thirty-six years had expired, still vested with the power to lease its road, franchises, etc., to any individual, or individuals, or other company.    It follows from the foregoing that the lease of the Georgia Railroad & Banking Company to William M. Wadley in 1881 was legal; that he had the power to assign the right thus acquired; and that the present lessee, or assignee of that right, namely, the Louisville & Nashville Railroad Company, possessed the power to lease a part of the right of way of the Georgia Railroad & Banking Company to the Atlanta Belt Line Company for the latter's terminal facilities.

2. The Atlanta Belt Line Company also possessed the statutory power to lease its road, property, and franchises to another railroad company with whose road its own connected or formed a continuous line.    Civil Code, § 2179.    It made such lease, on November 30, 1900, to the Atlanta & West Point Railroad Company, with whose line its own connected at Oakland City, in Fulton County, about two miles west of the eastern terminus of the Atlanta & West Point Railroad, and thus formed a continuous line from Oakland City eastward.    Did the Atlanta & West Point Railroad Company have the statutory power to accept this lease?    On September 11, 1900, its stockholders, to the end that it might be legally authorized to purchase or lease the Atlanta Belt Line road, duly and regularly adopted, by a large majority vote, the resolution that its charter be amended by adopting the provisions of the general act for incorporating railroads, as contained in sections 2167(6), 2173, and 2179 of the Civil Code.    Accordingly, on September 12, 1900, the charter was amended (under § 1840 of the Civil Code) so as to make the provisions of such sections a part of the same.    On October 18, 1900, at an annual meeting of the stockholders of the company, a resolution was unanimously adopted which, after reciting that the charter of the company had been amended, granting it power to buy or lease the Atlanta Belt Line Railroad, authorized and empowered the board of directors of the Atlanta & West Point Railroad Company to buy or lease the Atlanta Belt Line Railroad, if they should deem such action advisable, the terms of the pur-

chase or lease being left by the resolution to the wise discretion of the board.    The lease, as we have seen, was made on November 30, 1900.    It is true, as was ruled in *Alexander* v. *Atlanta & West Point Railroad Company*, 108 *Ga.* 151, that these amendments to the charter of the Atlanta & West Point Railroad Company, being fundamental, radical, and vital, to be valid should have been based on the unanimous consent of the stockholders.    We think, however, that the resolution adopted by a unanimous vote of the stockholders, on October 18, 1900, reciting that the amendments had been made, and empowering the board of directors to buy or lease the Atlanta Belt Line road, was such an acceptance and ratification of the amendments, by all the stockholders, as operated to legally make the amendments part of the charter of the company, just as if the unanimous consent of the stockholders had been obtained prior to securing the amendments.    See 7 Am. & Eng. Enc. L. (2d ed.) 682, and note 1, where it is said:    "The general rule as to the acceptance of amendments to charters is, that acts of user under an amendment to a corporate charter for which no authority can be found except in such amendment, and which amendment is supposed in good faith to be beneficial to the corporation, are evidence of an acceptance of such amendment by the corporation, and make it the law of the corporation and binding upon all its members."    Citing, Illinois River R. Co. *v.* Zimmer, 20 Ill. 654; Foster *v.* Essex Bank, 16 Mass. 245.    See also Cincinnati R. Co. *v.* Cole, 29 Ohio St. 126.

In Elliott on Railroads, vol. 2, § 446, that author says: "In some of the States the statutes grant a right to lease to connecting lines. . .    It is held that under such a statute it is not essential to the validity of a lease, that the leased road shall be an extension from either terminus of the main line, but it may be merely a collateral branch, forming a continuous road, by way of the junction, to either terminus of such main line, in as direct a route as the average railroad.    The pivotal question under such statutes is whether the line to which the lease is executed is a connecting line."    Hancock *v.* Louisville Railroad Co., 145 U. S. 145.

Our general railroad law authorizes one railroad company to lease its road, etc., to another company with whose road "it shall connect or form a continuous line."    Civil Code, § 2179.    When enacting such law, the legislature manifestly had in view and meant a

connecting line of railroad as then defined in our Code.   The definition of a connecting line is found in sections 2212 and 2213 of the Civil Code, which are the same as sections 719(q) and 719(r) of the Code of 1882. These sections were construed in *Logan* v. *Central Railroad*, 74 *Ga.* 693–4, as follows: "Section 719(q) declares the connecting line to be any line 'at the terminus, or any intermediate point;' and section 719(r) describes the connecting line by prescribing that 'where any railroad, in this State, joins another at any point along its line, or where two of such roads have the same terminus, either line having the same gauge may, at its own expense, join its track by proper and safe switches.' So that it must be only an adjacent road, capable of being joined by switch to the other, and this may be at the terminus or anywhere on the line where they meet or converge or connect, at village or depot or city." The Atlanta & West Point Railroad and the Atlanta Belt Line were, therefore, connecting lines at the time of the latter's lease to the former.   By this lease the Atlanta & West Point Railroad Company succeeded to all the rights, property, and franchises of the Atlanta Belt Line Company, among which was the leasehold to that part of the right of way of the Georgia Railroad & Banking Company upon which the terminal yard, the subject-matter of this litigation, is located.   And the Atlanta & West Point Railroad thus became a connecting through line with the Georgia Railroad, because the Atlanta Belt Line connected, at its eastern terminus, with the Georgia Railroad.   This legal conclusion is clear, for the Atlanta & West Point Railroad Company is as much a common carrier over the Atlanta Belt Line, leased by it, as over its own line.   *Logan* v. *Central Railroad*, 74 *Ga.* 685 (4).

3. After this connection of the Atlanta & West Point Railroad with the Georgia Railroad and the location and construction of the terminal yard had been secured under statutory powers, the Atlanta & West Point Railroad Company and the Louisville & Nashville Railroad Company entered into a mutual traffic contract, by which the Atlanta & West Point Railroad Company was granted trackage rights over the right of way of the Georgia Railroad & Banking Company into Atlanta and the joint use of the depot, warehouses, yard, offices, and other railroad appurtenances of the Georgia Railroad & Banking Company in the city; and the Louisville & Nashville Railroad Company was granted the joint use of property

held by the Atlanta & West Point Railroad Company in the city, and also of the terminal yard at or near Inman Park. This contract facilitated not only the transportation of freight to the consignees of the Atlanta & West Point Railroad Company in Atlanta, but shipments from Atlanta westward over the Atlanta & West Point Railroad and eastward over the Georgia Railroad, and also through shipments, eastward and westward, over both roads. Instead, therefore, of disabling either road to transact its own business, the facilities of each road for the transportation of freight were thus materially increased, and the general public correspondingly benefited. The law upholds such a contract. 1 Elliott, Railroads, § 42; 2 Ib. §§ 356, 357, 358, and cases cited. See *Georgia Railroad & Banking Co.* v. *Friddell*, 79 *Ga.* 489.

4. From what we have said above it is seen that the terminal yard, the operation of which the defendants in error seek to enjoin, was located and its construction authorized under statutory powers. In such cases the general rule, supported practically by an almost unbroken line of authorities, is, that a work so located and constructed, if constructed and operated in a proper manner, can not be adjudged a nuisance. This applies with special force to works thus authorized to facilitate transportation on railroads, which are of a quasi-public nature. 19 Am. & Eng. Enc. L. (1st ed.) 923, 924, and notes; 4 Wait's Ac. & Def. 784; 2 Elliott, Railroads, § 718, and note; 1 Wood, Railroads, § 212; 2 Wood, Nuisances, § 753; 1 High, Inj. (3d ed.) § 767; *Vason* v. *South Carolina R. Co.*, 42 *Ga.* 631; *Burrus* v. *Columbus*, 105 *Ga.* 42; Beideman v. Atlantic City R. Co. (N. J. Eq.), 19 Atl. 731; Leavenworth v. Douglass (Kas.), 53 Pac. 123; Attorney-Gen. v. N. Y. & L. B. R. Co., 24 N. J. Eq. 49; Hinchman v. Paterson H. R. Co., 17 N. J. Eq. 75; Watson v. Fairmont & S. Ry. Co. (W. Va.), 39 S. E. 193. See also *Bacon* v. *Walker*, 77 *Ga.* 336; *Western & Atlantic R. Co.* v. *Cox*, 93 *Ga.* 564; *Long* v. *Elberton*, 109 *Ga.* 28. From this rule it follows that injuries and inconveniences to persons residing near such works, from noises of locomotives, rumbling of cars, vibrations produced thereby, and smoke, cinders, and soot, and the like, which result from the ordinary and necessary, and therefore proper, use and conduct of such works, are not nuisances, but are the necessary concomitants of the franchises granted. *Austin* v. *Augusta Terminal Ry. Co.*, 108 *Ga.* 687–9; Wood, Railroads, 722; Whitney v. Maine C. R. Co., 69 Me.

208; Beseman *v.* Penn. R. Co., 50 N. J. Law, 235; Costigan *v.* Penn. R. Co., 54 N. J. Law, 233; Cleveland & Pittsburg R. Co. *v.* Speer, 56 Pa. St. 325. We think these rules are based upon the soundest reason, and are clearly distinguishable from cases like that of Baltimore & Potomac R. Co. *v.* Fifth Baptist Church, 108 U. S. 317, where railroads erect engine-houses, coaling-stations, or workshops on their rights of way, from which the emission of ordinary noises, smoke, soot, and cinders may be a nuisance to owners and residents of abutting property, like other cases of lawful business not partaking of a public nature and not having legislative sanction. See Sawyer *v.* Davis (Mass.), 49 Atl. 27; Romer *v.* St. Paul City R. Co., 77 N. W. 825. To make such rules uncertain is to invite a mass of litigation and clog the wheels of commerce.

The contention of the defendants in error, that this terminal yard of switches and side-tracks is a nuisance at Inman Park, because dwellings were erected there before the construction of the yard, and it could have been located at another point, where there were no residences, without being a nuisance to any one, is without modern legal precedent to sustain it, and is unsound for at least two reasons. In the first place, the terminal yard was located at the terminus of one railroad, on an existing right of way of another railroad, and under statutory power. We have adverted, in paragraph one of this opinion, to the power of the Atlanta Belt Line Company to locate its eastern terminus on the Georgia Railroad at or near Inman Park, and to the defendants in error being remediless to change that location after the work was completed, even if they had any right to stop the work at all. We also referred to the power of that railroad company to acquire by lease land for its necessary facilities at such eastern terminus. It had the power to put in all the side-tracks it needed, and side-tracks can not be put in without switches. "A power to build side-tracks is essential to the purpose and use of the road. A power to build a railroad of a single track without the means of passing the trains or of leaving the track for the shifting of cars, and without standing room for the cars not in motion, would be clearly wanting in all that is necessary to safety, convenience, and utility, and would be vain and nugatory. . . A switch is but a mechanical contrivance or movable opening to pass cars from one track to another. . . The spot where the openings in the main track should be placed falls within the

absolute discretion of the company, and can not be readjudged by a private citizen who lives along the line of the road." Cleveland & Pittsburg R. Co. *v.* Speer, 56 Pa. St. 325. In the second place, it is obvious, if the terminal yard is a nuisance because located near dwellings, that it would clearly be a nuisance wherever it might be put, even in the woods or in a field, as soon as the owners of the adjacent land built houses on their land; for the old rule, maintained by some authorities, that coming to a nuisance will prevent a person so coming from making any complaint, has long since been exploded. 16 Am. & Eng. Enc. L. (1st ed.) 934; *Savannah & Western Ry. Co.* v. *Woodruff*, 86 *Ga.* 94 (3); People *v.* White Lead Works, 9 L. R. A. 722; 2 Wood, Nuisances, § 574.

5, 6. While the rule above stated is undoubtedly correct, in view of the authorities, it does not follow that railroad works authorized by statute can not become nuisances by their improper construction, or by their negligent and improper use after a proper construction. 2 Wood, Nuisances, 761; 19 Am. & Eng. Enc. L. (1st ed.) 925; 4 Wait's Ac. & Def. 785. The reason is, that such exceptions do not fall within the legislative grant. It is therefore correct, in such qualified cases, to hold railroad companies to an accountability; for the legislative power given to them to construct a work, which relieves them from all liability for the ordinary and necessary incidents flowing therefrom, though causing annoyance to others, does not invest them with an unbridled license to use their own property as they please, without any consideration for, and to the great detriment of, the rights and property of others. Some of the instances under which it is generally held that a nusiance may arise from the improper conduct of a railroad work authorized by statute, and which points are involved in this case, are: 1. Using defective engines which scatter unnecessary quantities of sparks, cinders and smoke. *Austin* v. *Augusta Terminal Ry. Co.*, supra. 2. The improper management of proper locomotives by using a greater amount of steam than is reasonably necessary, by which an unusually large number of sparks are emitted, in attempting to draw too heavy a load up grade. 3 Elliott, Railroads, § 1225. 3. The sounding of whistles, ringing of bells, and blowing off of steam, at improper times and in an unnecessary manner. *Austin* v. *Augusta Terminal Ry. Co.*, supra. 4. The running of trains or cars, or using locomotives on Sundays, by which churches are rendered less val-

uable for the purposes to which they are devoted, and divine worship therein on such days is greatly and unreasonably disturbed from noises, smoke, and cinders, not to speak of the like discomfort on these days to individuals residing at such points.  3 Wood, Railroads, 1615, 1616; 4 Wait's Ac. & Def. 758; First Baptist Church *v.* Schenectady & Troy R. Co., 5 Barb. 79.

From what we have heretofore said it will be seen that the defendants had, under statutory powers, the lawful right to locate and operate at Inman Park, on the right of way of the Georgia Railroad & Banking Company, a properly constructed and properly operated terminal yard, and if they did no more than this, the operation of the yard could not be prevented by an injunction, for they could not be enjoined from doing that which the law authorized them to do; but the statutory power to locate and operate the yard at the point in question was impliedly and necessarily qualified by the limitation that it could only be lawfully exercised by constructing and operating the yard in a proper manner, that is, with due regard to the rights of others.  So, while a properly constructed and properly operated yard at this point could not be a nuisance, a railroad terminal yard thus located might be a nuisance if so improperly constructed as to produce, even when carefully operated, noises, smoke, cinders, etc., in greater quantities than would be produced by such operation, if it were properly constructed; and, though properly constructed, its negligent and improper operation might produce noises, smoke, cinders, etc., largely in excess of what would result from its proper operation, and thus create specific nuisances, which the plaintiffs would have the right to enjoin. There was some evidence tending to show that the yard was improperly constructed, in that it was built upon a grade and not upon a level, and also evidence tending to show that the noises, smoke, etc., complained of and which resulted from the operation of the yard were greater than necessary to a proper conduct of the business.  On both these points there was much and strong evidence to the contrary ; and as to the first there was a very decided preponderance of testimony to the effect that the construction of the yard was proper.

Reading the opinion of his honor below in the light of this fact, and carefully considering the same, together with the terms of the order granting the injunction, we have no hesitation in concluding

that he did not grant the injunction upon the theory of improper construction of the yard. In other words, if the evidence had been precisely as it is, save that it had affirmatively appeared that the yard had been built upon a dead level, no one reading Judge Gober's opinion in the case could have the slightest doubt that his judgment would have been just as it was. This being so, can the granting of the injunction be sustained upon the view that the noises, smoke, etc., were greater than necessary, and that, as a consequence, the entire operation of the yard was a nuisance? We think not. The order provided: "That on and after the first day of October, 1901, the defendants, and each of them, their officers, agents, and servants be and are hereby restrained and enjoined from doing any of the acts complained of on the tracks, road-bed, right of way, or premises of the Georgia Railroad & Banking Company opposite Inman Park and the residences of petitioners, in switching and using the same for terminal purposes, and from doing the acts complained of at said places, as set forth in their original and amended petition." In the light of what has been laid down above, this order was too broad, in that its necessary effect was to enjoin the prosecution of a lawful business, even though properly and legitimately carried on. If in the carrying on of this business there were features rendering it, to a greater or less extent, a nuisance, the evidence should have been sufficiently clear to enable the judge to ascertain, with some degree of definiteness, in what respect there were excesses in the matter of making noises, emitting smoke, etc., so that he could, in the order of injunction, point out and prevent whatever acts over and beyond those necessary did constitute nuisances. The evidence in this case falls very far short of coming up to this requirement. If there were unlawful features connected with the operation of the yard, the evidence fails to separate them from those that were lawful, and to so point them out that the judge could, by injunction, prevent their repetition.

As to the inconveniences, annoyances and disturbances, complained of as a continuing nuisance, resulting from the operation of the terminal yard on Sundays, and forming the fourth excepted instance hereinbefore specified, we think the plaintiffs' case is sustained by the facts and the law. Sunday is not an ordinary working day. It is " a day observed by the Christian world as holy and set apart for the purpose of rest and worship." 24 Am. &

Eng. Enc. L. (1st ed.) 528 – 9. This is in part shown by the interdiction put by the statute upon the starting of freight-trains in this State after twelve o'clock, midnight, on Saturdays, or the arrival of such trains at their destinations after eight o'clock a. m. on Sundays, that had been started at a proper time, excepting freight-trains of live stock, fruit, vegetables, and other perishable articles. Penal Code, § 420. It has been held that a railroad company is not bound to carry passengers or freight on Sunday, even when a statute permits it to do so; and if it contracts to do so and afterwards fails to carry out the contract, it is not an infraction of the company's general duty as a common carrier. See note in 24 Am. & Eng. Enc. L. (1st ed.) 540, and cases there cited. The pastors and the trustees of two churches located in Inman Park testified, in common, that the loud noises on Sundays, from the blowing off of steam, ringing of the bells of engines, and the moving of the engines and trains back and forth over the tracks beside and near the churches, cause intolerable noises, jar, and inconvenience to all worshiping in the churches; that the dense volumes of smoke, soot, and cinders, which are emitted from the engines and pervade the church buildings during church services on Sundays cause the greatest discomfort and annoyance to the pastors and the congregations; and that it is often impossible to hear what is being said by the pastors in the churches. It is to be noted, too, that these inconveniences are confined to the locality of the churches and terminal yards, and that the general public do not share in them. These facts are not denied by the railroad companies. They merely state that it is " occasionally " necessary to use the yard for switching purposes on Sundays, although the evidence shows that the yard is so used on Sundays very frequently. In no part of the evidence for the railroad companies is it stated that such work on Sundays is a necessity, except, as above mentioned, " occasionally." The evidence, then, shows that such work is carried on, on Sundays, more as a matter of convenience to the railroad companies than of necessity, and, therefore, is done unnecessarily. The exception usually made in favor of works of necessity on Sundays does not embrace work which is merely convenient but not necessary. 24 Am. & Eng. Enc. L. (1st ed.) 542. Consequently, what is done in this regard unnecessarily is a nuisance. See, also, Village of Pine City *v.* Munch (Minn.), 6 L. R. A. 763. The remedy

for this objectionable feature, so far as the defendants in error are concerned, is to enjoin that, and nothing else; which is the procedure adopted by this court in the case of *Hill* v. *McBurney Oil & Fertilizer Co.*, 112 *Ga.* 788, where only the unnecessary blowing of the factory whistle was restrained. We therefore conclude, after a careful consideration of this case in all its bearings, that the judgment of the court below, granting an interlocutory injunction, should be reversed, except only as to restraining the use of this terminal yard for switching purposes on Sundays; and direction is given that the judgment be so modified as to apply only to the Sabbath day.

.*Judgment reversed, with direction. All the Justices concurring, except Lewis, J., absent.*