PLATT, Respondent v. MEIER, Appellant
(153 N.W.2d 404)

(File No. 10328.  Opinion filed October 25, 1967)

**Overpeck, Hamblin & Mueller, Walter Mueller,** Belle Fourche, for plaintiff and respondent.

**Bangs, McCullen, Butler & Foye, Thomas E. Simmons,** Rapid City, **Charles R. Hayes,** Deadwood, for defendant and appellant.

BIEGELMEIER, Judge.

Plaintiff sues for injuries received as a volunteer actor or super in the Passion Play produced by defendant. The facts and some of the issues involved in this appeal generally appear in the dissenting opinion except for some details of the evidence which will be added in the course of the opinion. Defendant seasonably moved for a directed verdict in much detail on the grounds plaintiff failed to establish as a matter of law that defendant was negligent in failing to provide a safe area

or erect a fence, or that failure thereof was the proximate cause of plaintiff's injuries; that plaintiff assumed the risk thereof; that her injuries were caused by the negligence of fellow servants and her own contributory negligence. This motion and one for judgment n. o. v., made after a jury verdict for plaintiff, were denied. Plaintiff's appeal assigns and the brief argues that such denials were erroneous.

■ It being undisputed plaintiff was a gratuitous employee, she is excluded from the provisions of the Workmen's Compensation Law, Schmeling v. Jorgensen, 77 S.D. 8, 84 N.W.2d 558, and neither party is subject to any of its provisions. The defenses of contributory negligence, assumption of risk and the fellow servant rule are available to defendant. Schmeling v. Jorgensen, supra; Stoner v. Eggers, 77 S.D. 395, 92 N.W.2d 528; 35 Am.Jur., Master and Servant, § 334.

There seems to be some uncertainty and confusion of the negligence charged in this action. The complaint claimed only "the proximate cause of Plaintiff's injury was Defendant's negligence in failing to provide a safe area for said pageant and failing to guard said area with suitable fence or guardrail."[1] Plaintiff's injuries occurred in the crucifixion scene as she and other participants were screaming, yelling and running down the path, so the topography and physical aspects of the area will be described in that sequence. Plaintiff testified she was standing on a grassy area on the lower plateau in front of the higher crucifixion plateau during that scene. This grassy area appears to be smooth and level at the top and over ten feet wide; it proceeds down along the edge of the hill on what is referred to in the testimony as a "path", however, it appears to be at least eight feet wide with the usual cut bank on the left side and a 45° slope of the hill on the right side; it then makes roughly a U-turn to the right with a large open space on the outside of the turn to accommodate the participants and permit Roman guards on horses to

---

1. The lack of a guardrail is listed in plaintiff's brief as one basis of evidence of negligence. Ex. K, introduced in evidence by plaintiff shows a railing along the path where plaintiff fell. The railing was installed and picture taken after the accident, but as no objection was made, the question of its admissibility is not presented. 65A C.J.S. Negligence § 225. Though the court instructed the jury to disregard that improvement, its effect on the jury is not difficult to predict.

leave the procession as they go up the hill. The surface changes to gravel at this U-turn and proceeds down below and along side the described grassy area, path and slope mentioned. The distance from the lower plateau to the U-turn is not clear—it appears to be a five-foot decline over a distance of 20 or 30 feet. Plaintiff further testified on cue she moved about 15 or 20 steps over the grassy plateau area to go down toward the U-turn and was near the side of this grassy area above the slope of rocks and undergrowth when the two boys ran into her. She fell down this slope along the path seven or eight feet to a place on the inside edge of the U-turn. By moving to the edge of the path she had thereby also put herself on the edge of the slope.

■ On the one side of this path the hill was the built-in wall; the outside was not then, nor had it ever been, guarded by a fence or railing. On the construction and condition of the plateau, plaintiff's brief admits it

"was apparent to anyone observing the area and it was equally observable to the Plaintiff. As to this fact there was no superior knowledge thereof on the part of either Plaintiff or the Defendant. That, however, is not the issue."[2]

The evidence compels that conclusion as to plaintiff's knowledge there was no fence or railing for she testified:

"Q * * * you * * * participated in the Golgotha Hill scene knowing there was no railing * * *

"A Oh, I'd never seen it. * * * I had no reason to believe that it was (a dangerous situation)."

---

2. Later plaintiff's brief under title of "Proximate Cause" claims: "The proximate cause of the injuries to the Plaintiff herein was due to the failure on the part of the Defendant to furnish the Plaintiff with a safe place * * * it was only reasonable that a fence, railing, or a barrier of some kind be required along the ledge of the plateau * * * a barrier * * * would have prevented the accident from occurring. The Defendant failed in his duty and is liable * * * on account thereof." Again plaintiff says: "the jury by their verdict found it was negligence not to have some kind of barrier on the plateau to prevent just such an incident." If we were to accept this as the proximate cause, judgment would be for defendant for reasons appearing later in the opinion that this did not constitute negligence.

Defendant also testified "it was not" a dangerous spot. By plaintiff's own admissions she had taken part in over 250 performances for some 24 to 25 years and knew there was no railing along the path. Plaintiff is bound by her own statements and cannot make a stronger case than her own testimony establishes. Ford v. Robinson, 76 S.D. 547, 80 N.W.2d 471.

■ It is the duty of the master to furnish his servant with a reasonably safe place to work. We have so held. Stoner v. Eggers, supra, also Schmeling v. Jorgensen, 77 S.D. 8, 16, 84 N.W.2d 558, 563, and Voet v. Lampert Lumber Co., 70 S.D. 142, 15 N.W.2d 579, which uses the phrase "a reasonably safe place"; Olson v. Kem Temple, A.A.O.M.S., 77 N.D. 365, 43 N.W.2d 385; and 35 Am.Jur., Master and Servant, §§ 138 and 183. Other courts are in accord, 35 Am.Jur., Master and Servant, § 183.[3] That has been held to be the basis of recovery for a paid domestic employee, Gordon v. Clotsworthy, 127 Colo. 377, 257 P.2d 410, 49 A.L.R.2d 314, and others. See also the annotation in 49 A.L.R.2d 320, footnote 6.

■■ A master cannot be held liable for failure to furnish a reasonably safe place to work if the condition or so-called danger is so obvious and is before the servant's eyes to such an extent that he must know by the use of ordinary intelligence the possible danger that confronts him. Stoner v. Eggers, supra, and Ecklund v. Barrick, 82 S.D. 280, 144 N.W.2d 605. Our holding is the lack of guardrail was a condition that existed, was not the proximate cause of plaintiff's injuries, and that by voluntarily continuing to take part in the pageant she accepted or assumed the risk of injury from the lack of guardrail. In this sense assumption of risk bars recovery because there was no break of the master's duty, no actionable fault on the part of the master, and, hence, no cause of action. Maher v. Wagner, 62 S.D. 227, 252 N.W. 647.

---

3. The trial court instructed the jury it was the duty of defendant to make safe the place where the employee was required to render services and failure thereof rendered the employer liable. Plaintiff states it was taken verbatim from the first sentence of 35 Am.Jur., Master and Servant, § 183; however the next sentence qualifies this duty by the "reasonably safe place to work" standard. The instruction therefore was erroneous, but we do not reach that claim of error except in so far as to determine the standard of care and the sufficiency of the evidence to conform to it as a matter of law.

Restatement, Second, Agency, seems to be in accord with these conclusions.

"§ 492.   General  Rule

"A master who has performed his duties of care is either to provide working conditions which are reasonably safe for his servants and subservants, considering the nature of the employment, or to warn them of risks of unsafe conditions which he should realize they may not discover by the exercise of due care."

"§ 499.   Risks  Inherent  in  Enterprise

"A master who has preformed his duties of care is not liable to a servant harmed by a risk incident to the nature of the work."

"§ 521.   Servant's Assumption of Risk

"In the absence of a statute or an agreement to the contrary, a master is not liable to a servant for harm caused by the unsafe state of the premises or other conditions of the employment, if the servant, with knowledge of the facts and understanding of the risks, voluntarily enters or continues in the employment."

Comments under this section not only clarify it, but place the burden of proof on plaintiff:

"Comment:

"a.   *   *   *   Although a master has neither used care to make the premises safe nor care to warn his employees that they are not safe, and although he has no reason to believe that the employees know of the lack of safety, he is not liable to employees who in fact know of the conditions and realize the danger therefrom (unless by sections 522-524 not here applicable)

*     *     *     *     *     *

"c. \* \* \* The risk \* \* \* may exist at the beginning of the employment or it may arise subsequently because of changed conditions.

"d. **Burden of proof.** In maintaining an action against a master for failing to provide conditions of safety, a servant harmed thereby must allege and prove, not only that the master had reason to believe that the conditions were unsafe, but also that the servant had no knowledge thereof. \* \* \*"

Plaintiff voluntarily chose to continue in this part of the play[4] and we agree with the statement in her brief that the construction and condition of the plateau, including the lack of guardrailing, was not an issue upon which to base a conclusion defendant was negligent in that respect.

■ Eliminating the lack of guardrail as negligence, and therefore the proximate cause of plaintiff's injuries, leaves only that she was knocked down by the two boys. This was the immediate cause of her injuries and thus the proximate cause. Schmeling v. Jorgensen, 77 S.D. 8, 18, 84 N.W.2d 558, 564. It is undisputed they all were members of the cast engaged in the same common employment and so fellow servants. The common law defense that the injuries were caused by the negligence of a fellow servant or employee being available to defendant, such negligence gives rise to no cause of action against the employer by an employee so injured. 35 Am.Jur., Master and Servant, § 334. The fellow servant doctrine is stated in that text to be:

"There is, perhaps, in the law of master and servant, no more firmly established common rule than the

---

4. Mrs. Yanzick, another participant in the pageant and a friend of plaintiff, started with her on the march to Golgotha, but dropped out before coming to the bridge and went around behind the tomb as apparently marchers were free to do. Some stop below, some on the path, some behind the tomb and some at various other points.

one which absolves the employer from liability to one engaged in his employment for injuries incurred or suffered solely as the result of the negligence, carelessness, or misconduct of others who are in the service of the employer and who are engaged in the same common or general employment as the injured employee."

Restatement, Second, Agency, announces the rule in § 474 as:

"A master is not liable to a servant \* \* \* who \* \* \* is injured solely by the negligence of a fellow servant \* \* \*"

subject to some exceptions not applicable—one being liability of a master for non-delegable duties. These non-delegable duties are explained in later sections in 35 Am.Jur., Master and Servant, and under Title C on page 435 of the cited Restatement. The latter indicates the master incurs liability if he does not use care to keep the servants' working conditions reasonably safe, or if those he employs for such purpose, do not use such care to keep the working conditions reasonably safe. However, having furnished a safe place to work, suitable tools or appliances, etc., the employer is not liable for negligent performance of operative details or the transitory negligent act of an employee in the use of a proper tool. See 35 Am.Jur., Master and Servant, §§ 335, 358, 359 and 360. A similar statement appears in Comment a, § 492 of the cited Restatement which states the effect of the two sections (§ 474, fellow servant rule and § 492, general rule) is that an employer is "not liable to a servant for the negligence of fellow servants in the operative details of the business". A similar section in the Restatement relieves the employer of liability:

"§ 500. Transitory Dangers

"The master's liability for unsafe working conditions does not extend to temporary dangerous conditions of which the conduct of fellow servants in the performance of operative details of the work is the sole responsible cause."

18

Again under § 492, Comment f, is found the exemption from lia-
bility even "if the master neglectfully or intentionally fails to
perform what otherwise would be his duty, a servant who be-
comes aware of a dangerous condition of employment ordinarily
has no cause of action for harm thereby suffered. See § 521."
Plaintiff therefore may not recover from defendant as her in-
juries were caused by fellow servants.

■ Plaintiff contends defendant should be liable, assert-
ing he knew, and defendant did not know, about the pushing,
bumping and running of younger persons on the plateau and did
not warn plaintiff thereof. We have examined the evidence care-
fully and have come to the conclusion defendant only knew
of complaints youngsters sometimes "laughed or chew gum or
* * * misbehaved, and they were told not to"; that they
were "pushing people" in other scenes below, but not on Cru-
cifixion Hill, and word had come to him they were running
straight down the hill instead of on the path, yet in 25 years
he never had a complaint they were knocking anybody down.
The court admitted evidence by plaintiff of a conversation with
defendant after the accident in which he told her his daughter
(at a time not stated) had been run into and stumbled a few
steps. Assuming it was admissible, this evidence did not fasten
liability on defendant for either of two reasons. If held sufficient
to charge defendant with knowledge of the limited facts elicited,
we conclude it was insufficient[5] to charge him with knowledge
there was conduct resulting in people being knocked down. If
sufficient for the latter purpose to charge defendant with know-
edge of this conduct when he was the central figure and actor
in the climax of the play, then plaintiff as part of the crowd or
mob was chargeable with knowledge of its activities and as-
sumed the risks and dangers involved. In the many times she
had taken part in the play she had mingled with and was a
part of the participants who were running, screaming and yell-

---

5.  Plaintiff's testimony that supports this contention is:
    "Q  Prior to July 11th, 1963, when you participated in this particular scene, had
    you ever observed anyone pushed or anyone falling in the area where you fell?
    "A  No, I haven't.
    "Q  Prior to this day had you ever heard of anyone making any complaints to Mr.
    Meier about the dangerousness of this particular area?
    "A  Not to my recollection."

ing.[6] What was said of the lack of railing likewise applies to this conduct. Restatement, Second, Agency, § 505, Comment j, states:

> "j. **Defenses**.....A servant working with other servants whom he knows to be incompetent or too few in number ordinarily has no cause of action against the master if he is hurt because of this. See § 521."

She was where she had equal or better knowledge of what was occurring for 25 years than defendant (see 35 Am.Jur., Master and Servant, § 128) and if there was pushing, etc., she chose to continue in this part of the play which was voluntary on her part.[7] She is chargeable with knowledge of the condition of the area, i. e., that it had no railing, and of the past conduct of the cast and will not be heard to claim ignorance of either. This was not the unforeseen situation or unanticipated conduct present in Nepstad v. Randall, 82 S.D. 615, 152 N.W.2d 383, which was held to be no bar to recovery under the assumption of risk doctrine.

The trial court erred in denying the motion for judgment n. o. v. and the judgment is therefore reversed with instructions to enter judgment for defendant.

ROBERTS and RENTTO, JJ., concur.

HANSON, J., dissents.

HOMEYER, P. J., concurs in dissent.

HANSON, Judge (dissenting).

This action for damages is the result of personal injuries sustained by plaintiff, Grace M. Platt, while acting as a super in the crucifixion scene of the Passion Play. The defendant,

---

6. Plaintiff testified:
   "we * * * go screaming, running down the hill. * * * you move running, shouting down the hill. * * * Well, the lights are turned off all over the place and then the lightning starts flashing as we start running, screaming. And thunder, and everybody yelling, and everybody working up an excitement. · * * * and everybody's trying to get there at once and I have always taken it real slow around the first curve and then run and scream with the rest of them. * * * Do I know it? Yes."

7. See Note 3.

Josef Meier, is owner of the play and portrays the Christus in all its productions. The jury returned a verdict of $18,000 in favor of plaintiff and defendant appeals. As grounds for reversal he alleges (1) Insufficiency of the evidence, (2) Improper instructions, (3) Admission of improper evidence and (4) Misconduct of counsel.

The Passion Play portrays the last seven days of the life of Christ. It was established in 1938 at Spearfish, South Dakota, by the defendant Meier who is now its sole owner, manager, and supervisor. The play is presented in an open amphitheater every Tuesday, Thursday, and Sunday night during the summer months. It consists of twenty-two different scenes with no intermission. A professional cast of from 80 to 90 persons is regularly employed as actors, stagehands, ushers, ticket sellers, ticket takers and car parkers. In addition, each performance requires 120 to 150 supernumeraries or "supers" as they are commonly called. These people receive no compensation. They are furnished under an arrangement with the Spearfish Chamber of Commerce and various churches. A participating church agrees to furnish a certain number of people for each performance and is paid a certain sum by the Chamber of Commerce. Defendant pays nothing.

The amphitheater is located on a hillside on the western edge of Spearfish. The stage consists of the main city gate, the home of Mary and Martha, Pilate's house, center stage, temple building, council platform, the Garden of Olives and tomb area. Thereafter, there is a bridge, and a gravel pathway leading up to the crucifixion area on the Hill of Golgotha. As the hill slopes west to east the audience faces east with the main city gate to the north and crucifixion hill to the south.

Originally the crucifixion scene took place on top of the hill, but in 1947 this was moved lower down the hillside where two plateaus were provided. The higher level is now used for the crucifixion and participants in the play are stationed on the lower level. From the bridge to the plateau where the participants stand during the crucifixion scene there is a steep rise of approximately 18 feet. Except for the gravel pathway the side

of the hill is covered with rocks, weeds, bushes, stones, and gravel. As the pathway nears the first plateau there is a sharp turn to the left and a sharp rise of about four feet to a level grassy area. The ledge of this lower plateau is not protected in any manner by a fence, rail, or hedge.

On the evening of July 11, 1963 plaintiff went out to participate in the play as a super with her friend, Mrs. Belle Yanzick. She was given a costume and took part as usual in several scenes prior to the march to Golgotha. The march entered the stage from the main or north gate and proceeded in a southerly direction. Roman Guards, on horseback, led the procession followed by Temple Guards and the two thieves. Then came defendant portraying Christ carrying the cross. He was followed by a group of priests and citizens composed of professional actors and supers including the plaintiff and her friend. The procession proceeded past the buildings on the stage area and continued down to the Garden of Olives and tomb area, where persons under 14 years of age and others who do not desire to proceed further drop out by going behind the tomb. Mrs. Yanzick dropped out at this point and plaintiff continued on by going across the bridge and up the pathway to Golgotha.

Some 25 or 30 participants continued in the procession. When they reached the plateau they were spaced and stationed by priests in charge. Plaintiff was placed directly in front or north of the higher plateau upon which the crosses stood.

After the scene in which Christ is crucified a cue is given by defendant. All lights are turned off and an electrical storm is simulated by means of a tape recording and flashing lights. During the storm participants descend the hill, running, screaming, and yelling to express fear, excitement, and consternation. It was during this part of the crucifixion scene that plaintiff was injured.

When the cue was given plaintiff turned to her right and commenced walking toward the graveled pathway. As she neared this area of descent she was suddenly struck from behind and knocked over the ledge of the plateau. She landed

about 8 feet down the rocky hillside receiving the injuries complained of. Prior to being struck plaintiff had not seen anyone running or lunging at her. Two other persons, who probably were boys acting as supers, also fell with her. However, they left without rendering aid and without being positively identified.

As a super plaintiff was serving without pay or expectation of reward. She was, therefore, a gratuitous employee. Sec. 225 Restatement, Second, Agency. This is a lowly position of employment. Only those who render services for pay under a contract express or implied have a remedy under our Workmen's Compensation Act and "those who serve gratuitously are excluded from its purview." Schmeling v. Jorgensen, 77 S.D. 8, 84 N.W.2d 558. However, an employer is responsible to a gratuitous employee for his want of ordinary care, SDC 17.0203, but in an action for damages a gratuitous employee is subject to the common law defenses of contributory negligence and assumption of risk, when applicable under the facts.

Plaintiff alleged the proximate cause of her injury was defendant's failure to provide a safe area for the pageant and failure to guard the area with a suitable fence or guardrail. In this respect a master has a personal, continuing, and nondelegable duty to provide a suitable and safe place to work for his employees and servants. He is not an insurer of their safety, but is responsible to them for his negligence or want of ordinary care in failing to provide a reasonably safe place to work. 56 C.J.S. Master and Servant § 183 et seq.; 35 Am.Jur., Master and Servant, § 183, p. 610. This includes the duty of providing a sufficient number of competent fellow servants and supervising and controlling their conduct so there is not an unreasonable risk of harm to other servants. Sec. 505 et seq. Restatement, Second, Agency. The fellow servant rule does not absolve a master from his own negligent conduct.

In providing a safe place to work defendant was under a duty to exercise ordinary care under the circumstances. The degree of care required was commensurate with the risk of harm reasonably to be anticipated. This duty of care extended to the working conditions under which plaintiff and other participants

in the pageant were required to descend the Hill of Golgotha in darkness after the crucifixion. It was for the jury to determine whether or not defendant furnished a safe place to work under the circumstances, and took the necessary precautions to control the conduct of fellow servants. Reasonable minds might well differ in this regard. Daniels v. Moser, 76 S.D. 47, 71 N.W.2d 739.

The evidence, on the other hand, presented no issue of contributory negligence. Defendant testified he did not know of any act of neglect on plaintiff's part. She was in his employ and her actions were controlled and directed by him. She stood where stationed and walked where directed. There is no evidence she placed herself in an unauthorized place, voluntarily or knowingly exposed herself to danger, or otherwise conducted herself in a negligent manner.

A servant may assume a risk of harm caused by the "unsafe state of the premises or other conditions of the employment, if the servant, with knowledge of the facts and understanding of the risks, voluntarily enters or continues in the employment". Section 521 Restatement, Second, Agency. Schmeling v. Jorgensen, 77 S.D. 8, 84 N.W.2d 558; Bartlett v. Gregg, 77 S.D. 406, 92 N.W.2d 654. Assumption of risk was not established in this case as a matter of law. The jury could reasonably find or infer from the evidence that plaintiff had no knowledge or was not aware of the risk of harm arising from younger members of the pageant cast shoving, pushing, and running down the Hill of Golgotha during the crucifixion scene. Defendant was aware of such conduct as it was a recurring problem. This is reflected in the following extracts of defendant's testimony:

"Q. And was there anybody there other than the supers to direct the movement down the hill, off the plateau and on down the hill?

"A. No, that was left to each individual. There was no direction coming down the hillside. Everybody took care of their own descent from the hill."

Defendant then admitted there was no fence, railing or hedge on the ledge of the plateau. When asked why he didn't consider this a dangerous spot he testified:

"A. The area represents part of the scene which does not call for a fence and the people participating in the scene have been directed to conduct themselves properly in the area, therefore, there was no danger."

Defendant further testified about his knowledge of the conditions existing during the crucifixion scene:

"Q. All right. Now I'll ask you this: In the 24 or 25 years that you have conducted this Play and put it on in Spearfish and prior to the 11th day of July, 1963, had you ever seen anybody get pushed or bumped into when they started running and leaving that hill?

"A. No, I've never seen anybody.

"Q. Had anyone ever complained to you that that had taken place prior to the 11th day of July, 1963?

"A. Yes. Yes.

*   *   *   *   *   *

"Q. I see. Now, did any of those complaints, Mr. Meier, any of those complaints allege and state that they were pushing people and knocking them down?

"A. No. Pushing, yes, but knocking down, no."

*   *   *   *   *   *

"Q. Now, I want to clear up something else. Do I understand your testimony now that these complaints you had over all these years did not concern what the youngsters did or what happened up on this plateau?

"A. In some cases, yes.

"Q. Well, now, how many complaints did you have as to misconduct of youngsters or others on this plateau? I don't want to mix it up with other instances.

"A. That is very difficult to ascertain how often that occurred. But word has come to me youngsters were running straight down the hill and I asked adults to help stop these children running down the hill because they not only endanger themselves but other people at the lower end of the hill."

The application of the fellow servant rule was properly submitted to and determined by the jury. The jury evidently concluded that plaintiff's injuries were not caused solely by the negligence or misconduct of the fellow servant who knocked her off the unguarded embankment. They apparently found defendant was negligent in the performance of his nondelegable duty of providing a safe place to work which was a proximate cause of her injuries. When such negligence combines and concurs with the negligence of a fellow servant in causing harm to a servant the employer is responsible for the resulting harm.

Instruction No. 8 informed the jury that "an employer owes to his employee the duty to make safe the place where they are required to perform their services. Failure therein renders the employer therein liable to an employee who may have sustained injuries as the proximate result of his neglect." As previously stated an employer has an obligation to provide a "reasonably safe place to work" or as otherwise expressed to "exercise ordinary care in providing a safe place." Standing alone Instruction No. 8 is not a complete or correct statement of an employer's duty. However, elsewhere in the instructions negligence is correctly defined as "want of ordinary care or skill" and the jury was advised to apply that standard in each instance to conduct under consideration. When read and considered as a whole the jury was correctly advised that defendant was only obligated to exercise ordinary care in providing a safe place to work. "It is not necessary that the law applicable to all questions in a case be stated in each instruction in a series, it being sufficient if all, when considered as a whole, state the law correctly." 53 Am.Jur., Trial, § 546, p. 435.

Defendant assigns error with reference to other instructions given and refused by the court. We have carefully considered

these objections and conclude the instructions in this case cannot be commended for their clarity, completeness, and continuity nor can they be condemned to the degree of constituting reversible prejudicial error. As a whole they advised the jury as to the issues and the applicable law.

In relating a conversation had with defendant eleven days after her accident plaintiff testified he told her "his daughter had been run into similar only from the back and she had stumbled a few steps and was lucky enough to catch herself". In view of defendant's denial of any danger such evidence was relevant and competent to show his knowledge of the probability of harm arising from the conduct of his employees during performances of the pageant. Allen v. McLain, 75 S.D. 520, 69 N.W.2d 390. It may be inferred such incident was prior in time to plaintiff's accident.

During the course of defendant's examination as an adverse witness he was asked what arrangements had been made for a doctor to be present in the event of accidents. This was objected to as being immaterial and the objection was sustained. Thereafter, in order, defendant was similarly asked what arrangements had been made for an ambulance, a first-aid kit, and a nurse. Objections to these questions were all sustained. Defendant contends his motion for a mistrial should have been granted for misconduct of counsel in pursuing an immaterial line of inquiry. The record in this regard shows no objection was made to plaintiff's pursuing this line of inquiry and the court was not asked to admonish plaintiff to desist or to instruct the jury to disregard the same. As each question was asked an objection was made and the court ruled thereon. This line of inquiry was not material to any issue in the case and objections to the questions were properly sustained. Misconduct may certainly consist of attempting to get before the jury matters not in issue by asking improper questions or making improper offers of proof. 39 Am.Jur., New Trial, § 65, p. 80. However, the determination of whether or not misconduct of counsel warrants a new trial, of necessity, rests almost entirely in the discretion of the trial judge. He is in a position to sense, if any, the pre-

judicial effect of such misconduct. In the absence of a clear abuse of that discretion his ruling must be sustained.

The judgment appealed from should be affirmed.