Robert C. BAUMAN and Melanie
E. Bauman, Plaintiffs and
Appellants,

v.

Loren AUCH, Special Administrator of
the Estate of Garfield W. Bauman,
Deceased, Defendant and Appellee.

No. 18564.

Supreme Court of South Dakota.

Considered on Briefs Sept. 13, 1994.

Decided Oct. 4, 1995.

Peter J. Horner of Christopherson, Bailin & Anderson, Sioux Falls, for plaintiffs and appellants.

Michael L. Luce and Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith Sioux Falls, for defendant and appellee.

BASTIAN, Circuit Judge.

Robert and Melanie Bauman (plaintiffs), appeal the trial court's refusal to grant their motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial. We affirm in part, reverse in part, and remand.

### FACTS

Robert Bauman (Bob) was injured on June 5, 1989, when the horse he was riding reared up as he attempted to mount her, throwing him to the ground. The horse, Krissy, was owned by Bob's father, Garfield Bauman (Garfield), who is now deceased. Prior to his death, Garfield was the defendant in this action.

In 1979, Bob and his wife Melanie, purchased a small acreage near Harrisburg, South Dakota, for their electrical contracting business. About the same time, Garfield purchased land next to them to fulfill a lifelong dream of raising quarter horses.

Over the years, Bob and Garfield bought and kept horses. Garfield had grown up with horses. As a young man, he broke and trained horses, and had extensive experience riding range for cattle and hunting on horseback. Bob was less experienced. He usually worked ten to fourteen hours a day, six days a week, in his contracting business. He had owned three horses and trained one. In the summer he averaged riding horses once a week, usually riding one of the gentler horses. Bob and his family were involved in the day-to-day maintenance of the horses.

In June 1984, a quarter horse named Krissy was born to one of Garfield's mares. In the summer of 1986, when Krissy was old enough to be ridden, Garfield sent her to Theresa Hughes (Hughes), a professional trainer. Hughes rode Krissy about thirty times and while she thought Krissy was "high strung," she found the horse to be controllable.

After returning to the acreage that fall, Krissy was sent for training in the Canton area. She later returned again to the acreage. When she was about four-years-old, Garfield began riding her.

Garfield described Krissy as "spirited." He often used a "tie-down" bridle on Krissy in the spring of the year when she had not been ridden often but not on other occasions. A tie-down is used to limit the upward mobility of the horse's head and neck and, as a result, makes it difficult for the horse to get its front feet off the ground. Bob was unaware that Garfield used a tie-down.

Garfield was not the only person who regularly rode Krissy. Glenn Vogel, a friend of Garfield and employee of Bob, rode the horse about two dozen times in 1987 and 1988. He rode her three or four times in the month prior to the incident. Vogel thought Krissy was "a little flightier" than some quarter horses and "a little high strung." Vogel, who

characterized himself as a "fairly well experienced" horseman, never used a tiedown while riding her.

A farrier found Krissy to be one of the most difficult horses he worked on. Don Kohoutek, a neighbor who had raised horses for twenty years, observed that she had a different disposition than the other horses owned by Garfield and Bob. He described her as "flighty," "bossy," "aloof," and "irritable." In his opinion, these traits distinguished her from a normal quarter horse.

In the spring of 1989, when Garfield was unable to ride the horses because of illness, he asked Bob to ride Krissy to get her ready for him to ride in the summer. He did not instruct Bob to use the tiedown.

Bob rode Krissy for the first time on June 5, 1989. Bob had no difficulty saddling Krissy and riding her two miles to the neighboring Bill Allen farm. At the farm, Bob got off Krissy and talked with Allen for five or ten minutes. Krissy calmly stood near them and was petted by the Allen grandchildren. As Bob attempted to mount Krissy to return home, she side stepped away from him. On his second attempt, Krissy suddenly reared up. Bob was thrown from the horse and seriously injured.

A jury trial was held August 24–26, 1993. At the close of the evidence both parties moved for a directed verdict. Plaintiffs argued they had established liability of the defendant upon the theories of strict liability and negligence as a matter of law. Regarding strict liability, they argued the evidence was clear that Krissy was an abnormally dangerous domestic animal. Defendant's motion was based, in part, upon the opposite theory. The trial court denied plaintiffs' motion but granted defendant's motion on all claims except negligence and failure to warn. In making its decision, the trial court also indicated its impending ruling on plaintiffs' proposed jury instructions on abnormally dangerous domestic animals, stating

> viewing the evidence in the light most favorable to the nonmoving party, the evidence is clear that the horse was flighty and fidgety but I'm persuaded that the horse was not abnormally dangerous for its class and not a dangerous type horse that

would warrant granting that type of instruction to the jury. So, I'm going to let it go to the jury on the failure to warn and negligence type claim.

The jury returned a verdict in favor of the defendant. Plaintiffs then motioned for judgment notwithstanding the verdict upon the same grounds as those asserted in their motion for directed verdict. They also moved for a new trial upon the grounds that the trial court erred in instructing the jury on assumption of the risk and the burden of proof on affirmative defenses. They also claimed that the trial court erred when it refused to instruct on their theory of liability based upon abnormally dangerous domestic animals. The trial court did not rule on these motions and they are deemed denied. SDCL 15–6–50(b), 15–6–59(b). It is upon these claimed errors that Plaintiffs base their appeal.

## ISSUE I

WHETHER THE TRIAL COURT PROPERLY REFUSED TO SUBMIT TO THE JURY THE ISSUE OF WHETHER KRISSY WAS ABNORMALLY DANGEROUS?

■ Our standard of review of the circuit court's refusal to give a requested instruction is well settled and generally set forth in *Sommervold v. Grevlos*, 518 N.W.2d 733, 739 (S.D.1994). The trial court should instruct the jury on issues supported by competent evidence in the record and is not required to instruct on issues that do not find support in the record. Generally, failure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial. The party asserting error has the burden of showing prejudice in failure to give a requested instruction. The party asserting error must also show the jury might, and probably would, have returned a different verdict if the proposed instruction had been given. *Sommervold, supra.*

The possessor of a domestic animal may be subject to liability under either a strict liability or negligence theory for harm caused by it to others. Plaintiffs' theory was based upon strict liability. Their proposed jury instructions on this issue were generally premised upon Section 509 of the Restatement (Second) of Torts, which provides:

(1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

(2) This liability is limited to harm that results from the abnormally dangerous propensity of which the possessor knows or has reason to know.

Restatement (Second) of Torts § 509 (1977).

South Dakota law on liability for injuries caused by domestic animals has been long established; the approach is similar to the Restatement. A person possessing a domestic animal "known to be of vicious tendencies" is liable for such injuries as may be caused by the animal, regardless of the degree of care exercised by the owner in restraining and controlling the animal or the precautions taken by the owner of the animal to prevent its doing injury. This liability is subject to the defenses of contributory negligence and assumption of the risk. *Anderson v. Anderson*, 41 S.D. 32, 36, 168 N.W. 852, 852–53 (1918). The owner must have seen or heard enough to convince a person of ordinary prudence of the animal's inclination to commit the class of injury charged against it. *Warwick v. Mulvey*, 80 S.D. 511, 127 N.W.2d 433, 434 (1964). Where proof is made of mischievous propensities which cause injury to another, of which the owner knew or should have known, liability follows. *Id.*

The rule was reiterated in *Ross v. Hanson*, 86 S.D. 654, 656–657, 200 N.W.2d 255, 256 (1972):

Proof of negligence on the part of the owner in keeping or restraining a domestic animal is not essential to liability. Anderson v. Anderson, 41 S.D. 32, 168 N.W. 852. The gist of the action is the keeping of an animal after knowledge of its vicious propensity. Warwick v. Mulvey, 80 S.D. 511, 127 N.W.2d 433. As stated in 4 Am.Jur.2d, Animals, § 95, p. 343:

The owner is liable if he knew or should have known its dangerous propensities or that it was a probable source of harm, and proof that the owner of a vicious dog had notice of his vicious propensities may be made by introducing evidence of facts and circumstances from which an inference of knowledge arises. Knowledge of one attack by a dog is generally held sufficient to charge the owner with all its subsequent acts. There need be, however, no notice of injury actually committed, and therefore it is unnecessary to prove that a dog had ever before bitten anyone. In this respect, it is stated that the old doctrine that every dog is entitled to 'one bite' is out of harmony with a modern humanitarian society. The owner or keeper of a dog must observe manifestations of danger from him to human beings from *other traits than viciousness alone,* short of actual injury to some person, and cannot neglect to keep him in restraint until he has effectually killed or injured at least one person. (emphasis added).

The general applicability of the rule is stated in the comment section to § 509 of the Restatement:

In the usual situation to which the rule stated in this Section is applicable the animal is vicious, that is, has a tendency to attack human beings or other animals that is abnormal in animals of its class. The rule is also applicable if the animal is not vicious but has a dangerous tendency that is unusual and not necessary for the purposes for which such animals are usually kept. Thus one who keeps a large dog that he knows to be accustomed to fawn violently upon children and adults is liable under the rule stated in this Section for harm done by its playfulness or over-demonstrative affection. This is also true of one who keeps a dog that he knows to have an abnormal tendency to destroy crops and other vegetation.

Restatement of Torts (Second), § 509, comment c.

As the above quoted law indicates we should not unnecessarily focus attention on the word "vicious," a term more applicable to a dog, than to a horse. Concentrating upon the language of the Restatement, "dangerous propensity abnormal to its class," it is clear that more than sufficient evidence was presented to put the matter before the jury: (1) When its owner rode her at the beginning of each riding season, he used a special piece of equipment to restrain her: a tie-down, a device which kept her from getting her front legs off the ground. He used the tie-down because Krissy will "try to act up," "try to challenge you a bit," because "she's spirited, see." (2) Krissy was flighty, high-strung and nervous according to another individual who had ridden her before. (3) A farrier who had regularly shoed Krissy for years said she was "one of the top four or five worst horses" that he ever did. She had an "explosive personality," was not "totally trustworthy," and would throw her head back and "go crazy." "It was scary to work on her." On several occasions this farrier advised its owner to sell Krissy because she was dangerous, she was going to hurt somebody and she was not going to get better. (4) A neighbor familiar with Krissy testified that in his opinion the horse's characteristics were not normal for her breed; she was "unruly and extremely flighty." (5) Krissy's owner was familiar with these characteristics, and yet he never mentioned to his son, Bob, an inexperienced rider, that he should use a tie-down.

Admittedly, there was contradictory evidence that Krissy was not dangerous, but sorting out the truth was the jury's function. The only question the court had to decide was whether there was some competent evidence Krissy had a propensity abnormal to her class to commit the particular type of mischief that was the cause of the injury here. Considering all the facts adduced at trial, the court erred in ruling there was insufficient evidence to instruct the jury on this issue.

## ISSUE II

### WHETHER THE TRIAL COURT PROPERLY DENIED PLAINTIFFS'

## MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT?

 Our standard of a review is well settled. A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse. *Sabag v. Continental South Dakota*, 374 N.W.2d 349 (S.D.1985)

 A motion for judgment n.o.v. is based on and relates back to a directed verdict motion made at the close of all the evidence. Thus, the grounds asserted in support of the directed verdict motion are brought before the trial court for a second review. We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party, then without weighing the evidence we must decide if there is evidence which would have supported or did support a verdict. *Sabag, supra.*

 The plaintiffs moved for directed verdict and judgment n.o.v. arguing they had established liability of the defendant upon the theories of negligence and strict liability.

 As noted above, strict liability is imposed where the possessor of a domestic animal had reason to know prior to the damage causing event that the animal had dangerous propensities abnormal to its class. An exception exists where it is shown that the injured person has assumed the risk or is contributorily negligent, such as where someone rides a horse with knowledge of its vices. Questions of negligence, contributory negligence and assumption of the risk are for the jury in all but the rarest of cases so long as

there is evidence to support the issues. *Westover v. East River Elec. Power,* 488 N.W.2d 892, 896 (S.D.1992); *Gerlach v. Ethan Coop Lumber Ass'n,* 478 N.W.2d 828, 830 (S.D.1991).

Viewing the testimony and evidence in a light most favorable to the nonmoving party, and indulging all legitimate inferences therefrom, the trial court had sufficient evidence to deny the motions. Evidence supported a finding that Bob was well acquainted with the horse. He and his family were involved in the day to day maintenance of the horses, including Krissy. Having owned three horses and trained one, he was familiar with horses generally. Bob had observed both Vogel and Garfield ride Krissy on several occasions. This evidence is sufficient to cause reasonable minds to differ as to whether Bob was contributorily negligent or had assumed the risk by riding Krissy with knowledge of her vices, and whether Garfield was negligent in failing to warn Bob of a possible danger. The trial correctly determined that a directed verdict was not appropriate.

### ISSUE III

WHETHER THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON ASSUMPTION OF THE RISK AND THE BURDEN OF PROOF ON AFFIRMATIVE DEFENSES?

Plaintiffs claim the trial court erred in instructing the jury on issues of assumption of the risk and the burden of proof on affirmative defenses. The standard of review for jury instructions has been set forth above.

1. Assumption of the risk.

 Plaintiffs claim the trial court's instruction on assumption of the risk did not adequately reflect the law as stated in *Westover v. East River Elec. Power,* 488 N.W.2d at 900 and South Dakota Civil Pattern Jury Instruction 13–01. The *Westover* case and the pattern instruction require a tripartite analysis. The defendant must show 1) that the plaintiff had actual or constructive knowledge of the existence of the specific risk involved; 2) that the plaintiff appreciated the risk's character; and 3) that the plaintiff

voluntarily accepted the risk, having had the time, knowledge, and experience to make an intelligent choice. Failure to establish any one of the above three criteria would be fatal to this defense before the jury. *Westover,* 488 N.W.2d at 901.

At issue is Jury Instruction 26 which states:

"Assumption of the risk," means a person knows a hazard of injury exists if that person performs a certain act or assumes a certain position, and regardless of the hazard, that person performs the act or assumes or continues that position.

The trial court's instruction left out the third element. This element was highly critical in this case because a primary issue was Bob's inexperience with horses in general and Krissy in particular. This incomplete instruction was prejudicial error. *Dartt v. Berghorst,* 484 N.W.2d 891, 894 (S.D.1992). Counsel properly preserved the record for appeal by offering South Dakota's pattern jury instruction on this affirmative defense, which the trial court rejected.

2. Burden of proof.

 Plaintiffs also claim the trial court erred because it failed to adequately inform the jury that defendant had the burden of establishing the affirmative defenses of assumption of the risk and contributory negligence. Plaintiffs' proposed instruction on burden of proof was drafted in conformance with South Dakota Civil Pattern Instruction 21–01. The trial court did not use the pattern instructions on the issue.

In Instruction 5, the trial court told the jury that either party may have a "claim" in the trial. Instruction 6, in part, advised the jury:

Any party who presents a claim has a responsibility; that party must prove its claim. The law calls this responsibility the "burden of proof."

Instruction 22 informed the jury that Garfield "claims that Robert C. Bauman assumed the risk and was contributorily negligent."

 While this Court has approved the use of pattern instructions, there is no re-

quirement that trial courts use them. *State v. Latham*, 519 N.W.2d 68, 73 (S.D.1994). Rather, all that is required is that jury instructions, read as a whole, correctly state the law and inform the jury. *Id.* We cannot find that the trial court's instruction on the burden of proof was deficient.

Affirmed in part, reversed in part, and remanded.

MILLER, C.J., SABERS and KONENKAMP, JJ., and WUEST, Retired Justice, concur.

BASTIAN, Circuit Judge, for AMUNDSON, J., disqualified.

GILBERTSON, J., not having been a member of the Court at the time this case was submitted did not participate.