1996 SD 145

Douglas L. KUPER and Peggy D. Kuper,
Plaintiffs and Appellees,

v.

LINCOLN–UNION ELECTRIC
COMPANY, Defendant
and Appellant,

v.

Alvin BOSSMAN, d/b/a Bossman
Electric, Defendant.

No. 19334.

Supreme Court of South Dakota.

Argued May 21, 1996.

Decided Dec. 31, 1996.

Michael J. Schaffer and Sandra K. Hoglund of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiffs and appellees.

Thomas G. Fritz, R. Alan Peterson and Mary A. Gubbrud of Lynn, Jackson, Shultz & Lebrun, Rapid City, and Charles R. Kennedy of Kennedy and Nervig, Wadena, MN, for defendant and appellant Lincoln–Union Electric.

AMUNDSON, Justice.

[¶ 1.] **AMUNDSON, J., delivers the majority opinion of the Court on the jury instructions regarding the standard of care required for an energy distributor, preclusion of witness testimony, jury instructions concerning circumstantial evidence, and sufficiency of the evidence, Issues I, II, IV, and V.**

[¶ 2.] **KONENKAMP, J., delivers the majority opinion of the Court on submission of the case to the jury on the theory of nuisance, Issue III.**

[¶ 3.] AMUNDSON, J., writing the majority opinion as to the standard of care required for an energy distributor, preclusion of witness testimony, jury instruction concerning circumstantial evidence, and sufficiency of the evidence, Issues I, II, IV, and V.

[¶ 4.] Lincoln–Union Electric Company (L–U) appeals the jury verdict of $575,283.59 in damages awarded to Douglas L. and Peggy D. Kuper (Kuper). We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

[¶ 5.] L–U is a rural electric, nonprofit cooperative, existing under SDCL ch 47–21, to supply electrical power to members in Lincoln, Union, Minnehaha, Turner, and Clay Counties. L–U purchases its electricity from

East River Electric Power, which supplies power to a facility known as the Davis substation. The line carrying the electricity from the substation to the individual farm transformer is at 7,200 volts. The electricity L–U distributes to the farms is reduced at each farm transformer to between 120 and 240 volts and is then delivered to the house and farm buildings. Once the electrical power passes through the meter on the farmstead, the electricity belongs to, and is the responsibility of, the customer.

[¶ 6.] The portion of the system from the substation to the meter pole or individual transformer is known as the primary side, which is the responsibility of L–U. Everything past the meter pole or individual transformer is called the secondary side, which is the responsibility of Kuper. The electricity must make a complete circuit from the substation to Kuper's farm and back to the substation. On both the primary and the secondary sides of the system, a neutral wire accompanies the "hot" wire. The neutral wire is intended to be the primary path for the current to return to the transformer and the substation. For safety, the electrical wires must be grounded. (This is required by the National Electric Safety Code (NESC), which is the code governing a utility's construction and maintenance.) South Dakota has codified the NESC standards at SDCL 47–21–75. The ground rod is a steel rod driven into the soil. A wire called a "down ground" is attached to the primary neutral and the ground rod. This results in current flowing into the earth. Part of the current stays on the neutral wire and returns to the substation. Another part of the current returning to the substation on the neutral wire will travel down a ground wire into the earth and uses the earth to return to the substation. Once into the earth, the current follows an infinite number of pathways back to the substation to complete the circuit. This is known as "ground current."

[¶ 7.] Kuper began dairy farming in 1985 near Lennox, South Dakota. The dairy cows are machine-milked in a dairy barn. In March 1985, after three to four weeks of milking, Kuper noticed that one of the heifers began kicking and stomping like it was getting a shock. Kuper contacted an electrician, Alvin Bossman (Bossman), to investigate. It was at this time that Kuper learned that stray voltage [1] could be a factor causing the cow to react. On March 18, 1985, Kuper notified L–U, which was their electricity cooperative, that 1.3 volts of stray voltage had appeared between the dairy barn's floor and the steel milk pipeline. This exceeds the electrical industry average and L–U's stated policy maximum of .5 volts.

[¶ 8.] About six months later, Kuper noticed strange and nervous behavior in more cattle. In addition, the herd began to experience severe problems with mastitis.[2] Kuper's veterinarian examined the herd, their eating habits and living conditions, and could not find a cause for the affliction. Other stray voltage symptoms that arose were a reluctance to enter or exit the barn or stall, irritation or agitation, high-stepping, not eating, kicking or dancing, miscarriages of calves, abnormal tail swishing, reduced butterfat yields and decreased milk production. Kuper's veterinarian opined stray voltage was the cause of these problems. Kuper's evidence asserts stray voltage can prevent cows from going into heat and interfere with the development of an embryo after breeding. Also, stray voltage can cause mastitis because the voltage irritates the bottom of a cow's udder which prevents the udder's ability to ward off bacteria.

[¶ 9.] In May or June, 1990, Kuper again contacted L–U about the electrical problems. Numerous tests were performed by L–U employees on Kuper's farm at this time. In June, 1990, L–U installed an isolator to prevent electrical problems.[3] This device elimi-

---

1. Stray voltage is voltage within a cow environment that does not belong there and that a cow will feel. It is a low level voltage between two points that a cow can touch at the same time. This is known as a contact point, which causes the cow to become a part of the circuit.

2. Mastitis results from bacteria in the udder. This causes the cow's milk to be unusable due to clots or thin, watery milk.

3. An isolator is meant to disconnect the primary neutral (L–U) from the secondary neutral (Kuper). The isolation may be circumvented if the ground rods are too close together or by conduc-

nated the connection between the two neutrals so there would be no path for electricity from the primary side neutral to the secondary side neutral. By the end of 1991 or the beginning of 1992, Kuper again called L–U for assistance when one of their children received a shock in the barn.

[¶ 10.] In May, 1992, Kuper experienced an electrical shock. Bossman completely rewired Kuper's dairy barn upon suggestion of one of L–U's employees. Following the rewiring of the barn, L–U performed tests for stray voltage and found no problematic levels. In June, 1992, Kuper sold their least productive cattle and bought replacement heifers. These replacement cattle also showed stray voltage symptoms. On October 23, 1992, L–U tested Kuper's farm and found no levels of concern. Problems were found in the hog house, however, which Kuper rewired in the fall of 1992. The only time L–U's testing in Kuper's barn in December 1992 would show abnormal voltage levels was when chores were performed. In the latter part of 1992 or early 1993, an L–U employee explained to Kuper how voltage can become "ground current."

[¶ 11.] At L–U's suggestion, Wes Lane (Lane), a specialist in electrical testing from Otter Tail Power Company, came to the Kuper farm in January 1993. He took measurements at various locations and found acceptable levels of voltage. After completing his investigation, Lane submitted his report to Kuper and L–U. In February, 1993, Kuper purchased dairy cows from their neighbor. There had been no known previous health problems with these cows, however, after they were moved to Kuper's barn the cows became nervous and hard to drive into the barn. One newly purchased heifer miscarried her calf. In March, 1993, Kuper purchased from L–U a meter to measure stray voltage. Kuper found measurements in the barn ranged from 7.25 volts to 10.85 volts.

[¶ 12.] During this same time, Kuper hired Gerald Bodman (Bodman), an expert in the field of stray voltage, to come to their farm and conduct tests. Bodman tested every piece of on-farm equipment and did not find

sources that contributed to the stray voltage problem. Throughout the day, Bodman was unable to detect any voltage levels which were of a problematic magnitude on the farm. Shortly after 3:00 p.m. on the day of testing, Bodman noticed a recorder change showing .877 volts on a milk pipeline. He cut the primary grounding wire and noticed a voltage drop in the barn to .26 volts. Bodman did not find levels of stray voltage on the farm to be problematic, however, he did recognize symptoms of stray voltage in the dairy herd. Bodman believed that the stray voltage initially came directly from L–U's neutral conductor onto Kuper's neutral conductor then, after isolation, it came indirectly from L–U's neutral conductor through ground current. Bodman recommended that L–U: (1) not use metal to attach the conductors to a utility pole; (2) check every connection on their lines to make sure the connections were good; (3) increase the size of L–U's neutral conductor to reduce its resistance; and (4) move L–U's ground rod away from Kuper's transformer to eliminate the risk of ground current. On June 4, 1993, the ground rod for Kuper's transformer was moved. While L–U was moving this ground rod, the power was turned off to Kuper's farm. The stray voltage levels in the barn remained the same when the power to the farm was turned off.

[¶ 13.] By the time of trial, Kuper was milking only fifteen cattle because the herd had severe health problems. Before May, 1992, Kuper had only lost one cow, which died of milk fever. Between May, 1992, and the time of trial, seven of Kuper's cows died at or near the same location in the Kuper's yard. From 1988 through the time of trial, Kuper had to sell many cows due to mastitis. Kuper lost twelve to fifteen calves through miscarriages from May, 1993, until 1994. In addition, from 1992 to 1995, twenty to forty percent of Kuper's cattle did not conceive after being bred.

[¶ 14.] On September 9, 1993, Kuper commenced this action against L–U and Bossman for damages culminating from 1988 until

tive materials, like a waterline or highly conductive soils. L–U's ground for the primary neutral

at Kuper's transformer pole was next to the waterline leading to the barn.

1995.[4] Portions of Lane's findings were received in evidence, but he was not called by Kuper as a witness and L–U was not allowed to depose him because the trial court found that Lane was a nontestifying expert under SDCL 15–6–26(b)(4)(B).[5] At the end of trial, L–U renewed a motion for directed verdict, which was denied. Judgment was entered against L–U on the theory of negligence for $573,792.16 for the years 1988 through 1995. L–U created a nuisance to Kuper's property in the amount of $1,491.43 in damages, and L–U did not trespass or cause damage through negligence to Kuper's real estate. Pursuant to a pretrial agreement, Kuper only recovered on the theory for which he received the highest reward, negligence. L–U moved for judgment notwithstanding the verdict and for a new trial. Judgment was entered on August 10, 1995, for Kuper in the sum of $573,792.16, plus $129,081.13 in prejudgment interest. On September 21, 1995, the trial court denied both of these motions.

[¶ 15.] L–U presents the following issues:

I.  Whether the jury was erroneously instructed on the standard of care applicable to Lincoln–Union?

II. Whether the trial court committed reversible error when it precluded the testimony of Lane?

III. Whether the trial court erred in submitting this case to the jury on the theory of nuisance?

IV. Whether the trial court erred by not instructing the jury concerning circumstantial evidence?

V.  Whether Kuper introduced sufficient evidence to sustain the verdict?

[¶ 16.] **I.  Whether the jury was erroneously instructed on the standard of care applicable to Lincoln–Union?**

■ [¶ 17.] Our standard of review of the trial court's instructions is well established. " 'An appellant has the burden to show not only that the instruction given was in error, but also that it was prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict.' " *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63, 64 (S.D.1992) (quoting *Lytle v. Morgan,* 270 N.W.2d 359, 362 (S.D.1978)); *see also Sybesma v. Sybesma,* 534 N.W.2d 355, 359 (S.D.1995).

■ [¶ 18.] Both Kuper and L–U accepted jury instruction fifteen as a correct statement of the law. This jury instruction, which is South Dakota Pattern Civil Jury Instruction 10–01, stated:

Under the law as applied to the present case, every person is responsible for injury to the person or property of another, caused by such person's want of ordinary care or skill, subject to the defense of contributory negligence. When used in these instructions, negligence means want of such ordinary care or skill. Such want of ordinary care or skill exists when there is a failure to do that which a reasonably prudent person would do or when there is done that which a reasonably prudent person would not do; this in each instance in the same or similar circumstances as existed in connection with the conduct which is under consideration.

Kuper also submitted two other instructions on the issue of standard of care. Kuper's proposed instruction number twenty-one stated:

The distribution of electrical energy is a highly dangerous activity and anyone doing so is under a duty to exercise ordinary and reasonable care under all the circumstances to prevent injury to persons and property. This requires care commensurate with the danger involved consistent with the practical operation of the business.

---

4. The jury did not find Bossman had caused any damage to Kuper. Therefore, he is not a party to this appeal.

5. SDCL 15–6–26(b)(4)(B) states:
   A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial . . . upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

This language is gleaned from *Ward v. Lacreek Electric Association*, 83 S.D. 584, 590, 163 N.W.2d 344, 347 (1968). At trial, Kuper withdrew this instruction, since the trial court agreed to give jury instruction number twenty-three, which was given over the objection of L–U, and stated:

> Because of the dangerous nature of electricity, *the distributors of electricity are required to exercise the highest degree of care to avoid injury to others.* The degree of care of distributors of electricity is the degree which would be used by prudent persons engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the plant, to guard against contingencies which can be reasonably foreseen and anticipated. The supplier of the service, like electricity, is under a duty to warn when it has actual or constructive notice that the service is potentially dangerous for the use for which it is supplied. (Emphasis added.)

L–U argues that there are two misstatements of the law: (1) the language stating electricity is a dangerous activity; and (2) the placement of the "highest degree of care" on L–U. In *Ward,* we addressed the standard of care for an electric association. 83 S.D. at 590, 163 N.W.2d at 347. At the trial level, the court in *Ward* instructed the jury that "the defendant, LaCreek Electric Association, Inc., was under duty to the plaintiff, Hazel Ward, to exercise a high degree of care to determine if the breaker switches could be removed without injury to plaintiff's property." *Id.* This court directed the trial court on retrial to omit this instruction and suggested the following instruction:

> The distribution of electrical energy is a highly dangerous activity and anyone doing so is under a duty to exercise ordinary and reasonable care under all the circumstances to prevent injury to persons and property. This requires care commensurate with the danger involved consistent with the practical operation of the business.

*Id.* This instruction is identical to Kuper's proposed instruction number twenty-one, which they withdrew.

[¶ 19.] In *Lovell v. Oahe Electric Cooperative,* 382 N.W.2d 396, 398 (S.D.1986), we again addressed this issue and stated, "[t]he settled law in South Dakota, as evidenced by *Ward v. Lacreek Electric Association, Inc.,* 83 S.D. 584, 163 N.W.2d 344 (1968), is that the distributor of electrical energy must exercise ordinary and reasonable care under all the circumstances to prevent injury." In 1992, we revisited this issue and once again upheld our decision in *Ward. Westover v. East River Elec. Power Coop,* 488 N.W.2d 892, 898 (S.D.1992). The standard has not changed. The instruction here was correct in stating that electricity is a dangerous activity. However, the trial court committed error when it placed "the highest duty of care" standard on L–U.

[¶ 20.] We next need to evaluate whether the instruction received in error was prejudicial. L–U claims that the instruction was prejudicial because it confused the jury as to what was the proper standard of care; ordinary care versus the highest degree of care. Under our settled law, it was prejudicial to instruct the jury using the wrong standard of care. *See Magbuhat v. Kovarik,* 382 N.W.2d 43, 46 (S.D.1986); *Platt v. Meier,* 83 S.D. 10, 14 n. 3, 153 N.W.2d 404, 406 n. 3 (1967).

[¶ 21.] **II. Whether the trial court committed reversible error when it precluded the testimony of Lane?**

[¶ 22.] Prior to trial, L–U wished to depose Lane. Kuper moved to quash the deposition, arguing that Lane was a nontestimonial expert witness. The trial court granted Kuper's motion to quash the deposition. (Interestingly, part of Lane's report was viewed by the jury because it was used by other experts to form their opinion.)

[¶ 23.] "[A]dmissibility of an expert's opinion is within the trial court's discretion." *Application of Widdison,* 539 N.W.2d 671, 676 (S.D.1995) (citing SDCL 19–15–2; *Peery v. Dep't of Agriculture,* 402 N.W.2d 695, 696 (S.D.1987); *Buckley v. Fredericks,* 291 N.W.2d 770, 771 (S.D.1980)). We will not reverse a trial court's decision "absent a clear showing of an abuse of dis-

cretion." *Id.* (citing *State v. Hill*, 463 N.W.2d 674, 676 (S.D.1990); *State v. Logue*, 372 N.W.2d 151, 156 (S.D.1985)).

[¶ 24.] L–U continually tested the Kuper farm and was unable to find a problem. An employee of L–U recommended Lane as someone who could perform alternative tests. Kuper contacted Lane and Lane secured permission from L–U to perform the tests. The tests were performed on January 19, 1993, with the assistance of L–U. Kuper had not consulted or hired an attorney at this time. After completing his testing, Lane prepared a report which he mailed directly to L–U and Kuper. Kuper paid Lane's employer, Otter Tail Power Company, for Lane's inspection.

[¶ 25.] SDCL 15–6–26(b)(4)(B) provides:

> A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in § 15–6–35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

However, the facts leading to Lane being hired do not make him a nontestifying expert. Rather he should be treated as an ordinary witness. *See* Advisory Committee Note, 48 FRD 487, 503 (1970).[6] Lane was hired January 19, 1993, before this litigation evolved. (L–U was served on July 30, 1993, and the summons and complaint were filed on September 9, 1993.) Lane was contacted at the suggestion of L–U, not at the request of Kuper's counsel. L–U's employees assisted Lane during his testing. Finally, Lane mailed a copy of his report directly to L–U.

[¶ 26.] We have not previously addressed this issue. However, Federal Rule of Civil Procedure Rule 26(b)(4)(b) is identical to SDCL 15–6–26(b)(4)(B). " '[T]he mere designation by a party of a trial witness as an "expert" does not thereby transmute the experience that the witness acquired as an actor into experience that he acquired in anticipation of litigation for trial.' "[7] *Quarantillo v. Consolidated Rail Corp.*, 106 F.R.D. 435, 437 (W.D.N.Y.1985) (quoting *Nelco Corp. v. Slater Elec. Inc.*, 80 F.R.D. 411, 414 (E.D.N.Y.1978)). Lane was hired to "diagnose" the alleged problem on Kuper's farm. This is analogous to when a treating physician, who may qualify as an expert, is subject to discovery concerning the care and treatment of his patient. *See Quarantillo*, 106 F.R.D. at 437.

[¶ 27.] To prevent an undue benefit to the discovering party, the trial court may set parameters for the discovery.

> Since the deponent is to be deposed as an "actor," he is not required to disclose opinions formulated or knowledge gained during his preparations.... The fear of unfairness that was allayed by Rule 26(b)(4) is not a factor here as the deponent is to be questioned solely in his capacity as an "actor."

*Nelco*, 80 F.R.D. at 415. The *Nelco* court went on to state:

> Significantly, if the shadow of unfairness lurks within this case at all, it would be transposed to form only by a holding directly inapposite to the one reached herein. If the restrictions of Rule 26(b)(4)(A) were held applicable to the instant facts, future parties would be encouraged to employ as expert trial witnesses the participants in the very events which gave rise to their lawsuits. Thus, parties could cloak discovery sources in the protective veil of Rule 26(B)(4)(A) and thereby significantly impede the rightful access of their opponents

---

**6.** The Advisory Committee note states: "It should be noted that the sub-division [26(b)(4)(B)] does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an *ordinary witness.*" (Emphasis added.)

**7.** An "actor" is a person who has knowledge of facts and opinions which were held prior to being designated or involved as an expert in the underlying litigation. *Nelco Corp.*, 80 F.R.D. at 414.

to these sources. Such a result would clearly subvert the underlying purpose of discovery which is to make available to the respective parties all relevant facts involved in a pending action. *See* FedRCivP 26(b)(1).

80 F.R.D. at 416. Furthermore, as stated in *Magbuhat*, 382 N.W.2d at 45:

A trial judge has authority to compel discovery and to impose sanctions.... However, [this function] is designed to compel *production* of evidence and to promote, rather than stifle, the truth finding process. The severity of the sanction must be tempered with consideration of the equities. Less drastic alternatives should be employed before sanctions are imposed which hinder a party's day in court and thus defeat the very objective of the litigation, namely to seek the truth from those who have knowledge of the facts. (Emphasis in original.) (Citations omitted.)

The proper sanction would be to prevent L–U from seeking evidence from Lane regarding his relationship with Kuper. *See Rapid City v. Baron*, 88 S.D. 693, 697, 227 N.W.2d 617, 619 (1975).

[¶ 28.] In addition, as noted earlier, part of Lane's report was in reality received into evidence. A nontestifying expert can lose protective status when his report is either presented during trial or used by other experts in the formulation of their opinion. *See* Kristie L. Stolte, A Policy Analysis of the Exceptional Circumstances Standard: *Is Coates v. AC & S, Inc.,* Simply Another Step Toward the Search For Truth in Expert Discovery?, 37 SDLRev 639, 645 (1992) (citing *Heitmann v. Concrete Pipe Machinery*, 98 F.R.D. 740, 743 (E.D.Mo.1983)). Part of Lane's report was introduced into evidence by Kuper to demonstrate to the jury what Bodman had relied on in forming his opinion. L–U wanted to admit the whole report or call Lane as a witness.

[¶ 29.] The trial court is to act as a gatekeeper, not as a wall, excluding effective cross-examination of the report allowed into evidence and relied upon by another expert. The facts surrounding how Lane's data was compiled are just as important as the report itself. The purpose of a nontestifying expert

is to assist the litigant in preparation for trial and to assist in the formulation of trial theories. This record is totally devoid of any evidence that Lane was retained in anticipation of litigation or to prepare for trial. 8 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2032 at 445 (1994). The trial court made a very conclusory finding that Lane was a nontestifying expert and quashed his deposition.

[¶ 30.] Additionally, L–U must show that they were prejudiced by the exclusion of Lane's testimony. *Treib v. Kern*, 513 N.W.2d 908, 915 (S.D.1994). Lane found that L–U had "done an outstanding job" in testing and wiring on Kuper's farm. Also, L–U seems "to have eliminated any type of stray voltage problem [Kuper] has had in the past." Lane would have explained the tests he conducted and the results from these tests. Finally, he stated: "I do not feel that the levels of voltage recorded should present a stray voltage problem." Lane's testimony certainly falls within the ambit for the search for the truth, and L–U should be authorized to complete discovery with Lane. Therefore, the trial court erred in excluding the testimony.

**[¶ 31.] IV. Whether the trial court erred by not instructing the jury concerning circumstantial evidence?**

[¶ 32.] "Our standard of review of the circuit court's refusal to give a requested instruction is well settled.... On issues supported by competent evidence in the record, the trial court should instruct the jury." *Bauman v. Auch*, 539 N.W.2d 320, 323 (S.D. 1995). The trial court is not required to instruct on issues lacking support in the record. *Id.* "[F]ailure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial." *Id.* The burden of demonstrating prejudice in failure to give a proposed instruction is on the party contending error. *Id.*

[¶ 33.] L–U presented jury instruction number four:

> The mere fact that an accident happened and the parties sustained damages because of such accident, in and of itself, does not give rise to an inference that the accident was caused by anyone.

We have examined this instruction in the past. *See Del Vecchio v. Lund,* 293 N.W.2d 474, 476–77 (S.D.1980); *Henrichs v. Inter City Bus Lines,* 79 S.D. 267, 278, 111 N.W.2d 327, 332 (1961); *Orrison v. City of Rapid City,* 76 S.D. 145, 157, 74 N.W.2d 489, 495 (1957). However, in *Henrichs,* we recognized that "[i]n most jurisdictions it is not ordinarily reversible error to refuse or fail to give an 'unavoidable accident' or an equivalent accident instruction, since the substance of any such instruction is usually covered by other instructions given, especially those on negligence, proximate cause, and burden of proof." 79 S.D. at 278, 111 N.W.2d at 332 (quotations and citations omitted). Under the theories advanced in this case, we direct the trial court to give this instruction to the jury on retrial.

[¶ 34.] **V. Whether Kuper introduced sufficient evidence to sustain the verdict?**

[¶ 35.] We examine the record to determine whether there is competent and substantial evidence to support the verdict. *Zee v. Assam,* 336 N.W.2d 162, 165 (S.D. 1983). The evidence is examined in the light most favorable to the verdict, and gives the prevailing party the benefit of all reasonable inferences. *Westover,* 488 N.W.2d at 896.

[¶ 36.] In *Bridge v. Karl's, Inc.,* 538 N.W.2d 521, 523 (S.D.1995), we recognized the standard for reviewing motions for directed verdict and judgment notwithstanding the verdict:

> Our standard of review of the circuit court's denial of a directed verdict and of the jury's determination in favor of [the] plaintiff is well established. We must examine the evidence in the light most favorable to the non-moving party and give him the benefit of all reasonable inferences. The moving party is entitled to evidentiary consideration only where its evidence is uncontradicted or tends to amplify, clarify or explain the evidence in support of the verdict of the jury for the prevailing party. In such a context, it becomes our task to review the record and determine whether there is any substantial evidence to allow reasonable minds to differ. This court does not weigh the evidence and substitute its judgment for that of the jury. The decision of the jury is likely to be upheld as questions of negligence ... are for the determination of the jury in all except the rarest of instances. (Quotations and citations omitted.)

We will not overturn a ruling regarding whether a new trial should be granted without a clear showing of an abuse of discretion. *Dartt v. Berghorst,* 484 N.W.2d 891, 894 (S.D. 1992). An abuse of discretion is when no "judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.'" *Id.* (quoting *Jensen v. Weyrens,* 474 N.W.2d 261, 263 (S.D.1991)).

[¶ 37.] L–U claims three errors under this issue. The first assertion addresses whether Bodman qualified as an expert. Second, L–U alleges the evidence of lost profits was insufficient to justify the verdict. Third, L–U claims that the evidence of losses for the death of cows was insufficient to justify the verdict.

**A. Bodman's Testimony**

[¶ 38.] Opinions of experts are admissible under SDCL 19–15–2, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[¶ 39.] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482–83 (1993), the United States Supreme Court held that before expert scientific testimony may be received, it must be shown that: (1) it has been tested; (2) it has been subjected to peer review and publication; (3) the known or potential rate of error must be

known; and (4) to what extent it has received general acceptance. The *Daubert* Court explained:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481.

[¶ 40.] We accepted the *Daubert* test for expert scientific testimony in *State v. Hofer*, 512 N.W.2d 482, 484 (S.D.1994). *See also State v. Schweitzer*, 533 N.W.2d 156, 159 (S.D.1995). Although general acceptance in the scientific community is no longer required, *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794, 125 L.Ed.2d at 480, "the trial judge still has the 'task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.' " *Hofer*, 512 N.W.2d at 484 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485).

[¶ 41.] Bodman's credentials are: (1) he has worked in the field of stray voltage since 1975; (2) he has written professional papers on the subject of ground current or neutral return current which have been presented at several conferences; (3) he has investigated the phenomenon of stray voltage on approximately 800 dairy farms; and (4) he has been qualified as an expert on either the subject of stray voltage or ground current in the courts of Michigan, Wisconsin, Minnesota, Nebraska, Iowa, Missouri and Kansas. The trial court stated that Bodman qualified as an expert. Even under *Daubert* and our recent decisions following it, when the trial court is ruling on the admissibility of an expert opinion, the trial court needs to exercise its gatekeeping function. Expert opinions still need a reliable foundation. In this case, the trial court never ruled whether or not the subject of this expert's opinion rested on a reliable foundation. In order to have a meaningful appellate review, we always state that the trial court must rule or have the opportunity to rule on alleged errors. This foundational determination was not made. Therefore, on remand we instruct the trial court to complete this task in accordance with this opinion.

### B. Lost profits

[¶ 42.] L–U claims that the lost profits testimony was in error for it was based on faulty data. L–U failed to object to the admissibility of this testimony at trial and failed to preserve this issue for appeal. *See State v. Dornbusch*, 384 N.W.2d 682, 686 (S.D.1986). As we stated in *In re A.I.*, 289 N.W.2d 247, 249 (S.D.1980), "[g]enerally, error must be brought to the attention of the trial court as soon as it is apparent and failure to object at a time when the court can take corrective action precludes appellate review." Even incompetent evidence which is admitted without objection may be considered to have "the same force and effect as proper evidence." *Hannahs v. Noah*, 83 S.D. 296, 301, 158 N.W.2d 678, 681 (1968) (citations omitted).

[¶ 43.] We have examined the other issues presented by L–U and find them to be of no merit. We reverse and remand for retrial consistent with this opinion.

[¶ 44.] MILLER, C.J., and SABERS, KONENKAMP and GILBERTSON, JJ., concur.

[¶ 45.] KONENKAMP, Justice, writing the majority opinion on the submission of the case to the jury on the theory of nuisance.

[¶ 46.] **III. Whether the trial court erred in submitting this case to the jury on the theory of nuisance?**

[¶ 47.] Nuisance is governed by SDCL 21–10–1: "A nuisance consists in *unlawfully* doing an act, or omitting to perform a duty . . . ." (Emphasis added). Although this Court discounted the term "unlawful" in

*Johnson v. Drysdale,* 66 S.D. 436, 285 N.W. 301 (1939), our legislature has nonetheless made it quite clear that a public utility cannot be designated a nuisance. "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." SDCL 21–10–2. Rural electric cooperatives are specifically authorized by law. SDCL ch 47–21. They are required to construct, operate, and maintain their electrical distribution systems in accordance with the provisions of the National Electric Safety Code, which has been adopted in South Dakota. SDCL 47–21–75. *See Armory Park v. Episcopal Community Services,* 148 Ariz. 1, 712 P.2d 914, 921 (1985)("We would hesitate to find a public nuisance, if, for example, the legislature enacted comprehensive and specific laws concerning the manner in which a particular activity was to be carried out."). The dissent's reliance on *Vogel v. Grant–Lafayette Elec. Co-op.,* 201 Wis.2d 416, 548 N.W.2d 829, 836 (1996), is misplaced, as Wisconsin apparently has no statutory governmental authorization exception to nuisance claims. *Vogel* depends for its authority on common law.

[¶ 48.] The National Electric Safety Code mandates that electric distribution systems be grounded for public safety. As a matter of basic physical science, "stray voltage . . . is nothing more than the by-product of the transmission of electrical power . . . a normal and natural condition which is common to every power distribution system in this country." *Kolpin v. Pioneer Power & Light Co.,* 154 Wis.2d 487, 453 N.W.2d 214, 219 (Ct.App. 1990), *rev'd on other grounds,* 162 Wis.2d 1, 469 N.W.2d 595 (1991). No evidence exists in the record to indicate that levels of stray voltage at Kuper's dairy farm violated any statute or the National Electric Safety Code. Many public utilities emit by-products which may be troublesome to private property ownership, but the public's concern in maintaining utilities outweighs private interests. In granting an exemption from nuisance actions to statutorily authorized activities, our legislature obviously adopted a public policy that private interests must endure some inconvenience for the general populace to receive the benefits of utilities. Other jurisdictions have also recognized that utilities and businesses of a public nature and having legislative sanction should not be declared nuisances. See cases cited in E.E. Woods, Annotation, *Electric Generating Plant or Transformer,* 4 A.L.R.3d 902, 910 (1965)(citing cases holding public utility under legislative authority not liable for nuisance, absent negligence in the manner of operation). *See, e.g., State of Mo. Ex. Rel. Ashcroft v. Dept. of the Army,* 672 F.2d 1297, 1304 (8th Cir.1982)(applying Missouri law—operation of dam not public nuisance because it was authorized by law); *Georgia R.R. & Banking Co. v. Maddox,* 116 Ga. 64, 42 S.E. 315 (1902)(holding ordinary and necessary concomitants to operating railroad terminal authorized by specific grant of legislative franchise not nuisance). *Accord* Restatement (Second) of Torts § 821B cmt. f (1977).

[¶ 49.] Even if we were to bypass our statutes and resort to common law, we would be ill advised to go as far as to hold that nuisance applies to the circumstances of this case. Generally, a nuisance is a "condition which substantially invades and unreasonably interferes with another's use, possession, or enjoyment" of property. *Greer v. City of Lennox,* 79 S.D. 28, 32, 107 N.W.2d 337, 339 (1961). A private nuisance, the type considered in this case, falls into two categories—intentional and unintentional. *Id.;* Restatement (Second) of Torts § 822. We must take care to elucidate the difference. A private nuisance exists if a person's conduct is:

> the legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either, (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822. The unintentional forms of this tort, however, have fallen into disfavor, in particular because imposing nuisance liability without intent may result in liability without any fault. W. Page Keeton et al. *Prosser and Keeton on the Law of Torts* § 88, at 629–30 (5th ed 1984). *Cf. Ashby v. Northwestern Public Service Co.,* 490 N.W.2d 286, 290

(S.D.1992)(holding that strict liability will not be imposed on an electrical provider). One leading authority has noted, for example, that splitting the law of nuisance into intentional and unintentional theories "has produced much confusion and some erroneous results ... [therefore] nuisance [is a term] that should describe intentional torts." *Prosser* § 91, at 625.

[¶ 50.] "Intent," in its most commonly used sense, means (1) a state of mind; (2) about consequences of a given act, not about the act itself; and (3) having in mind a desire to cause certain consequences knowing these consequences are substantially certain to result. *Id.* § 8, at 43. Furthermore, an intentional intrusion in the nuisance context is an invasion

> that the actor knowingly causes [i.e., natural stray voltage] in the pursuit of a laudable enterprise [i.e., provision of electrical power] without any desire to cause harm.... It is not enough to make an invasion intentional that the actor realizes or should realize that this conduct involves a serious risk or likelihood of causing the invasion. [The actor] must either act for the purpose of causing it or know that it is resulting or is substantially certain to result....

Restatement (Second) of Torts § 825 cmt. c. The knowledge element on which the definition of "intentional invasion" turns exists not when the electric power company knows it is providing electricity with a natural by-product being stray voltage and ground current, but when the company knows these phenomena are occurring at unreasonable levels, causing harm to dairy cows and continues to act to cause the harm. Here, in an effort to alleviate the problem, L–U visited the Kuper farm over seventy times in response to their concerns about the dairy herd's reactions to stray voltage.

[¶ 51.] In cases where the offending elements, i.e., stray voltage and ground current, are phenomena naturally occurring in the production of electricity, annoying only to certain animal species and detectable by humans only with special instruments, the electrical provider will not know of it until the consumer points out that the levels of these elements are causing harm. Unique local conditions, including a farmer's own electrical appliances; the type of grounding, if any, of farm buildings; soil composition or the existence of current carrying objects in the ground; particular sensitivities of the animals; and other factors, may combine to produce problems with excessive stray voltage, circumstances of which a utility company may not be aware and over which it may have no control. Therefore, maintaining an intent element in the discussion of nuisance in such cases allows a more sound result, predicated on the actual knowledge and purpose of the tortfeasor. Nonetheless, based upon SDCL 21–10–2, no action for nuisance lies here.

[¶ 52.] MILLER, C.J., and SABERS, J., concur.

[¶ 53.] AMUNDSON and GILBERTSON, JJ., dissent.

[¶ 54.] AMUNDSON, Justice (dissenting on Issue III).

[¶ 55.] I dissent as to Justice Konenkamp's opinion regarding nuisance. A nuisance exists when a party unlawfully does an act or omits to perform a duty which "annoys, injures, or endangers the comfort, repose, health, or safety of others [or] in any way renders other persons insecure in life or in the use of property." SDCL 21–10–1; *see also Kryger v. Dokken*, 386 N.W.2d 481, 482 (S.D.1986) (stating "a nuisance involves an unlawful act or omission to perform a duty"); *Greer v. City of Lennox*, 79 S.D. 28, 32, 107 N.W.2d 337, 339 (1961). A nuisance is either public or private. SDCL 21–10–3 [8] Other jurisdictions have permitted nuisance claims for stray voltage. *Johnson v. Steele–Waseca Co-op. Elec.*, 469 N.W.2d 517, 518 (Minn.Ct. App.1991); *Kolpin*, 469 N.W.2d at 597.

---

8. SDCL 21–10–3 states: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. Every other nuisance is private." Since Kuper is just claiming injury to his property, this is a private nuisance action.

[¶ 56.] SDCL 21–10–2 states: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." SDCL ch 47–21 does authorize the creation and existence of rural electric cooperatives. However, it does not legalize stray voltage through a customer's property that exceeds the industry standard or to allow unreasonable ground current. Kuper's invitation to L–U did not include the power to send the stray voltage or unreasonable ground current. See E.E. Woods, Annotation, *Electric Generating Plant or Transformer Station as Nuisance*, 4 A.L.R.3d 902, 910 (1965) (if damage caused, and public utility authorized under legislative authority did not exercise due care, nuisance may exist). The jury was instructed on nuisance as follows:

> A nuisance consists of unlawfully doing an act, or omitting to perform a duty, which act or omission either: 1) annoys, injures, or endangers the comfort, repose, health, or safety of others; or 2) in any way renders other persons insecure in life, or in the use of property. But the defendant has no duty to correct or discontinue an alleged nuisance without knowledge of it. One cannot be said in any manner to neglect or refuse to perform a duty unless he knows or reasonably should have known that an act or omission involves peril or harm to another. If you find that the defendant reasonably had no knowledge that neutral-to-earth voltage from its primary distribution line was causing alleged harm to the plaintiffs' dairy cattle, then the defendant cannot be said to have breached a duty and cannot be charged with creating a nuisance.

L–U did have control over the ground rods and neutral wires on the primary side to effect the stray voltage and the ground current. L–U argues that *Crockford v. City of Hot Springs*, 68 S.D. 502, 4 N.W.2d 805 (1942), held that public utilities cannot be nuisance. This interpretation is only partially correct. The trial court found and we upheld in *Crockford* the findings that, since the sewer facility was "in accordance with modern and commonly accepted methods" and the emitted odor was "incident to its operation," it was not a public or private nuisance. 68 S.D. at 504–05, 4 N.W.2d at 806. Kuper alleged and the trial court believed that L–U is exceeding "modern and commonly accepted methods" by having stray voltage above .5 volts, the purported industry standard, and L–U's stated policy maximum. Therefore, *Crockford* is distinguishable.

[¶ 57.] Furthermore, in *Greer,* 79 S.D. at 31, 107 N.W.2d at 338–39, we held a public dump was not a nuisance per se in view of statutory authority to operate said dump. However, when the municipal corporation fails to perform its function in a reasonable manner, and to take reasonable precautions against damaging private property, its public dump may become a private nuisance. *Id.* at 32, 107 N.W.2d at 339. There is evidence in this case which, if believed by the jury, the fact finder, that L–U exceeded the industry standard.

[¶ 58.] Recently, the Wisconsin Supreme Court held that a dairy farmer could maintain a nuisance claim for damage to dairy cattle against an electric cooperative. *Vogel,* 548 N.W.2d at 829. In *Vogel,* the court stated: "We conclude that nuisance law is applicable to stray voltage claims because excessive levels of stray voltage may invade a person's private use and enjoyment of land." *Id.* 548 N.W.2d at 834.

[¶ 59.] L–U contends that the verdict was inconsistent based on the fact the jury found no damage to Kuper's real estate under negligence theory and did find damage under nuisance theory. Negligence and nuisance are two different torts. Damage to real estate is different than interference with the use and enjoyment of real property known as nuisance. In *Greer,* we stated:

> As a general rule, negligence is not involved in nuisance actions or proceedings, and is not essential to the cause of action. If a particular use of property causes a nuisance, this fact is itself sufficient to entitle a person injured thereby to entitle a person injured thereby to relief. If a nuisance exists, the facts that due care was exercised and due precautions were taken against the annoyance or injury complained of are immaterial; and the fact

that defendant has used the ordinary means to avoid the nuisance complained of which are used in general by others engaged in the same business is no defense. In fact, a nuisance may be created or maintained with the best or highest degree of care[.]

79 S.D. at 32, 107 N.W.2d at 339 (citations and quotations omitted); *see also* 3 Barry A. Lindahl, *Modern Tort Law Liability & Litigation* § 35.08 at 201 (RevEd 1995). Therefore, I would hold the trial court did not err in submitting the nuisance theory to the jury.

[¶ 60.] I am authorized to state that Justice GILBERTSON joins in this dissent.